## Siler, et al. v. White Star Coal Company, et al.

(Decided December 10, 1920.)

### Appeal from Harlan Circuit Court.

1. Contracts—Construction.—The cardinal rule in the construction of contracts is to ascertain from all of its terms the intention of the parties and give it such construction as will carry out that intention; but the intention to be administered is the one expressed by the words employed in the contract and not a secret, unexpressed and only mentally entertained intention.

2. Mines and Minerals—Lease—Construction.—A coal operating lease provided for the payment of a stipulated minimum royalty and in another clause of the contract it was agreed that if the lessee was prevented from mining sufficient coal to produce the minimum sum at the agreed rate because of certain enumerated causes and interruptions: Held, that if the lessee in any month was prevented by any of the interruptions from producing enough coal to pay the minimum royalty that sum should be reduced as provided for in the contract, since the clause providing for such interruptions operates upon and modifies the provision for the payment of a minimum royalty as much so as any other part of the contract.

TYE & SILER for appellants.

HALL & JONES for appellee, White Star Coal Co.

JAS. H. JEFFRIES for appellee, M. J. Moss.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appellee, White Star Coal Company, filed this suit on August 19, 1918, against appellants, Siler and Cornett, and appellee, M. J. Moss, to obtain a construc-

tion of a written contract entered into and executed by Siler and Cornett as first parties and M. J. Moss as second party on July 28, 1916, and to obtain the direction of the court as to how plaintiff should discharge its obligations in the future under that contract, which it is conceded by all parties was entered into by defendant Moss for the plaintiff's use and benefit. Prior to the execution of the written contract involved the plaintiff was conducting a coal mining operation on a tract of land in Harlan county containing about 1,200 acres, about 650 acres of which was owned by defendants, Siler and Cornett, and the remaining 550 acres owned by the defendant, M. J. Moss, plaintiff holding a lease privilege for extracting the coal thereunder by the terms of which it agreed to pay ten cents per ton royalty for all the coal extracted, 55% of which was to be paid to Siler and Cornett and 45% of which was to be paid to M. J. Moss, but the agreed minimum royalty was to be not less than $250.00 per month. Plaintiff had also acquired a coal operating lease to a tract of about 250 acres of land adjoining the 1,200 acres and in which none of the defendants owned any sort of title. In order to market the coal obtained from the 250 acres it was necessary to construct a tramroad over and across the land of Siler and Cornett and extending beyond the opened mines on their tract to the one of the 250 acre tract for a distance of about 3,600 feet. It was also necessary for mining operations on the 250 acres to construct miners' houses on the land of Siler and Cornett, and about 97 of them were constructed on their land, 27 of which were occupied by miners working at the Wallen mines, which is the name of the one on the 250 acres. After the extension of the tram road and the building of the additional miners' houses on their land, Siler and Cornett contended that they were entitled to additional pay over and above the royalty they were obtaining from the operation of the mine on their own land, as compensation for the easements and privileges enjoyed by the company in obtaining and marketing the coal from the 250 acre tract. To settle the dispute, which seems to have agitated the minds of all parties for some time, the written contract involved here was executed. At that time M. J. Moss and his immediate family connections owned about 80% of the stock of the White Star Coal Company and he executed the contract in question in his own name, but for the use and

benefit of his company, of which he was an officer, and he obligated himself individually therein that the company would perform all the agreements contained in the contract. The contract consists of nine (9) separate paragraphs, the first four (4) of which might be said to contain matters of inducement only and the remaining five (5) are in these words:

"(5)   Now, therefore, in consideration of the fact that said first parties have let and granted and do hereby lease, let and grant unto said White Star Coal Company a right of way and easement for the purpose of removing its coal from the three leases above named and referred to, out, over and across the lands of first parties, on Ewing's creek in Harlan county, Kentucky, the said M. J. Moss now hereby agrees and binds himself, his heirs and assigns to see that the White Star Coal Company will mine and remove, or have mined and removed, sufficient coal to increase the royalty due first parties and second party from the lands that are now leased to White Star Coal Company, and which are now being operated by it, to a minimum royalty of $750.00 per month, said increase in minimum royalty to begin June 1, 1917, and to continue during the life of the original leases to it and its predecessors, which the White Star Coal Company is operating from the lands of first parties and second party; and

"(6)   Whereas, under an agreement between first parties and second party, 55% of the $750.00 royalty per month, amounting to $412.50, is due to first parties, and 45% of the $750.00 royalty per month, or $337.50, is due to second party.

"(7)   It is now agreed by and between first parties and second party that in any month after June 1, 1917, that the White Star Coal Company does not produce sufficient coal from the lands of first parties to pay said first parties their 55% of $750.00 royalty per month, amounting to $412.50, that second party, to-wit, M. J. Moss, will pay immediately to first party a sufficient amount when added to the amount paid during such month by White Star Coal Company to make $412.50 for each and every month; and

"(8)   The White Star Coal Company, after June 1, 1917, is hereby authorized and directed in paying royalties to first parties and second party, to first pay to first parties, out of all royalties due both first parties and second party, the sum of $412.50, each month, and

the remainder, up to $750.00, to be paid to second party; all royalties above $750.00 per month to be divided 55% to first parties and 45% to second party.

"(9)   It is further hereby agreed between the parties hereto, that if at any time the White Star Coal Company shall be prevented from carrying out any and all of the covenants of the leases under which it is operating, by reason of epidemics, riots, insurrections, strikes, wars, car shortages or by failure of workable supply of coal on premises of first parties and second party, or occurrences of faults or other obstructions in mines, or by reason of any other outside conditions over which the White Star Coal Company has no control, and which is without fault or negligence on the part of said White Star Coal Company, then the minimum royalty of $750.00, as above stated, shall be reduced in proportion to the time lost by said interruptions by said above named causes."

It is the contention of appellants, Siler and Cornett, that under the terms of the above contract they are entitled absolutely to their proportion of the minimum royalty provided therein of $412.50 per month regardless of the occurrence of any interruptions on account of any of the causes stated in paragraph (9) of the contract, and that the contract obligates the White Star Coal Company to pay to them in any event their stated proportion of the minimum royalty each month and obligates M. J. Moss to do so if the coal company should fail, although some or all of the interrupting causes stated in paragraph (9) might prevent the mining of sufficient coal for the royalty to amount to that sum. The company and M. J. Moss insist that the interrupting causes in that clause operate upon and qualify all other clauses of the contract, including those fixing the minimum royalty and providing for its payment, and that if the company should be prevented by any such causes from mining sufficient coal in any month for the stipulated ten cents royalty to equal the minimum amount provided for such amount should be reduced, as is provided in paragraph (9). The trial court upon final submission construed the contract as contended for by the company and M. J. Moss, and being dissatisfied with that construction Siler and Cornett prosecute this appeal.

The cardinal rule governing courts in the interpretation of contracts is to ascertain the intention of the par-

ties thereto and give effect to that intention; but *the intention* which this rule applies is the one to be gathered from the words which the parties employ in stating their contract and not to any unexpressed or mental intention which they may have entertained but which they did not express, and in arriving at the intention which the terms employed import and manifest the entire contract should be looked to. 6 R. C. L. 835-837; Nelson Creek Coal Co. v. West Point Brick and Lumber Co., 151 Ky. 835; Owens v. Georgia Life Insurance Co., 165 Ky. 507; General Accident, Fire and Life Insurance Corporation v. Louisville Home Telephone Co., 175 Ky. 96, L. R. A. 1917D, 952; Miller v. New York Life Insurance Co., 179 Ky. 246, and Gabbard v. Sheffield, 179 Ky. 442. Stating these general rules (which this court in above cases approved) the text in R. C. L., referred to on page 835, says:

"It must not be supposed, however, that an attempt is made to ascertain the actual mental processes of the parties to a particular contract. The law presumes that the parties understood the import of their contract, and that they had the intention which its terms manifest. It is not within the function of the judiciary to look outside of the instrument to get at the intention of the parties, and then carry out that intention regardless of whether the instrument contains language sufficient to express it; but their sole duty is to find out what was meant by the language of the instrument. This language must be sufficient, when looked at in the light of such facts as the court is entitled to consider, to sustain whatever effect is given to the instrument. Taking into consideration this limitation, it may be said that the object of all rules of interpretation is to arrive at the intention of the parties as it is expressed in the contract. In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used."

And on page 837 it is further stated that:

"The intention of the parties, which courts seek to discover in giving construction to a contract, is to be gathered, not from particular words and phrases, but from the whole context of the agreement. In fact, it may be said to be a settled rule in the construction of contracts that the interpretation must be upon the entire instrument, and not merely in disjointed or particular parts of it. The whole context is to be considered in as-

certaining the intention of the parties, even though the immediate object of inquiry is the meaning of an isolated clause.  Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument.  The contract must be viewed from beginning to end and all its terms must pass in review; for one clause may modify, limit, or illuminate the other.  Taking its words in their ordinary and usual meaning, no substantive clause must be allowed to perish by construction, unless insurmountable obstacles stand in the way of any other course.''

Guided by these universally applied and undeviating rules for the construction of contracts we can find no possible ground to question the propriety of the court's judgment. It is proven and not denied that paragraph (9) in the contract involved here is the usual and customary one incorporated in all coal mining leases, especially in the coal mining fields of which Harlan county is a part. This fact is conceded by appellants, but they insist that the contract involved here is something more than an ordinary coal lease contract, since it grants easements and privileges necessary for mining *other* land and not ordinarily included in such contracts, and it is therefore urged that the payment of the minimum royalty each month regardless of the contingencies provided for in paragraph (9) was the consideration for such easements and privileges. This argument loses sight of the fact that the contract of July 28, 1916, increased the minimum royalty of appellants from $150.00 per month, which they were theretofore getting as their proportion, to $412.50 per month, which increase was evidently made in payment of the additional easements and privileges over and across the land of appellants.  To uphold the construction contended for by appellants would result in ignoring entirely paragraph (9) of the contract and to administer it, so far as appellants are concerned, as if that paragraph constituted no part of it.  Such an interpretation would be in the teeth of the rules above laid down for the guidance of courts in the construction of contracts. If paragraph (9) does not operate to reduce the minimum royalty of appellants, Siler and Cornett, as between them and the coal company, it would likewise not operate to reduce the minimum royalty stipulated to be paid M. J. Moss.  Giving all parts of the contract

the·meaning which the words employed naturally import, there is no escape from the conclusion that it was the intention of the parties in executing the contract of July 28, 1916, to provide that the coal company should pay a total minimum royalty of $750.00 per month, and that it should pay that·amount notwithstanding it failed to mine enough coal at the royalty rate to produce it, unless such failure was produced by some of the causes or interruptions stated in paragraph (9) of the contract, but if the company was prevented from mining sufficient coal to pay the minimum royalty at ten cents per ton because of any interruptions included therein, then the minimum royalty should be "reduced in proportion to the time lost by said interruption;" and M. J. Moss assumed the liability of a guarantor to Siler and Cornett that the coal company would perform all.of its obligations under the contract. The judgment of the court having interpreted the contract as indicated fully meets our approval and it is affirmed. ·