## Muncey Coal Mining Company v. Muncey.

(Decided January 16, 1925.)

### Appeal from Perry Circuit Court.

1. Contract—Intention Governs Interpretation—Intention Gathered from Language—Entire Contract Construed in Determining Intention.—Cardinal rule governing interpretation of contracts is to ascertain intention of parties, which intention is to be gathered from words employed in contract and not from unexpressed mental

intention, and in arriving at this intention entire contract must be looked into.

2. Mines and Minerals—Coal Lease Held to Absolve Lessees from Payment of Minimum Royalty upon Happening of Enumerated Contingencies Without Surrender of Lease.—Lease of coal lands held not to require payment of minimum royalty absolutely so long as lessee retained lease, and, if time was lost by reason of enumerated contingencies, obligation to pay minimum royalty was pro tanto suspended, and he was to that extent absolved from payment, though he did not surrender lease.

3. Mines and Minerals—Lessee of Coal Lands Held Not to have Sustained Burden of Proving Absence of Workable Coal Seam.— Lessee of coal lands held not to have sustained burden of proving absence of 36-inch workable coal seam, absolving him from payment of minimum royalty.

4. Mines and Minerals—Lessee Failing to Discover Existence of Workable Coal Seam After Diligent Efforts Not Obliged to Pay Minimum Royalty Until Seam Discovered.—Where lessee of coal lands made reasonable and diligent effort to discover coal, fact that he failed to discover existence of workable coal seam, without negligence on his part did not oblige him to pay minimum royalty until seam was discovered, under lease which provided for pro tanto suspension of royalty upon failure of 36-inch workable coal seam.

5. Appeal and Error—Judgment Affirmed, where Appellate Court Unable to Determine its Correctness Because of Absence of Necessary Maps from Record.—Where appellate court, because of absence of maps from record, is unable to determine exact location of trees which lessor of coal lands was alleged to have wrongfully cut, and lessor had right to cut trees on certain parts of leased premises, judgment refusing to deduct value of such timber from award in lessor's favor will be affirmed.

6. Mines and Minerals—Lessor of Coal Lands Held to Have no Lien on Adjacent Real Estate.—Where lease of coal lands provided that lessor's lien should extend to all property and effects coming on leased premises, "or that are used by or belong to lessee in running business under lease," held that under rule of ejusdem generis last provision referred to personal property only, and did not include adjacent real estate and property so affixed thereto as to constitute realty.

7. Costs—Where Record on Appeal in Poor Condition, Clerk's Costs will be Reduced.—Where record on appeal contained depositions not in order required by court rule 5, subdivision 3, and records were typewritten on very thin paper, making it extremely difficult to read, clerk's costs will be reduced.

J. W. CRAFT, PERCY N. BOOTH and W. H. MILLER for appellant.

FAULKNER, STANFILL & FAULKNER for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming in part and reversing in part.

So far as this appeal is concerned, the controversy between the parties hereto turns on the interpretation to be given certain clauses of a coal lease made by the appellee to one Stone, and which by successive assignments has come into the ownership of the appellant.

The first cause of controversy involves the tenth clause of that lease, which reads:

"The lessee agrees to enter upon the premises hereby leased, immediately, and begin in good faith the work of development and prosecute same with reasonable diligence, and it is agreed that no minimum or fixed royalty will be required until after one year from this date, except for the actual tonnage mined and shipped; but said lessee agrees that he will mine from the leased premises such an amount of coal during each and every year of this lease, beginning with January 1st, 1919, as will amount to and make the royalty due at least twelve hundred dollars ($1,200.00) or one hundred dollars ($100.00) per month for each and every month during the continuance of this lease, that is to say, that in event said lessee shall not have mined from the leased premises such amount of coal as will make the rent or royalty due each and every year during the continuance of this lease, that is, after said January 1, 1919, to the sum of twelve hundred dollars ($1,200.00), then the said lessee shall pay to the said lessors within the thirty days after the first of the succeeding year as liquidated rent or royalty for the said leased premises during the preceding year, an amount as in addition to the rent or royalty paid will make same for the said years amount to the said sum of twelve hundred dollars, as hereinbefore provided, said liquidated rent or royalty to be and become due and payable at the expiration of the thirty days aforesaid. Provided, however, that if at any time said lessee be prevented from carrying on his said mining operations on said premises by reason of any epidemic, labor trouble, riot, strike, insurrection, or war, car shortages, the act of God, or the failure of workable coal, 36 inches to be the minimum, or the occurrence of faults or other obstruc-

tions in the mine, without fault or negligence of said lessee, then the minimum rent or royalty with which said lessee is chargeable for the year including such period shall be reduced in proportion to the amount of time lost by reason of such interruptions, provided further, that the failure of the lessors at any time to demand and collect the minimum royalty due at any time on account of coal actually mined and shipped, and giving receipt therefor shall not operate or be construed as a waiver of their right to subsequently insist upon the payment of any minimum royalty then due or subsequently accruing under the provisions of this lease.''

The question is whether so long as appellant remains on the lease it is absolutely obligated to pay the minimum royalty of $1,200.00 a year beginning January 1, 1919, or may it be excused from such payment on account of ''the failure of workable coal, 36 inches to be the minimum, or the occurrence of faults or other obstructions in the mine, without fault or negligence of said lessee,'' to the extent of time lost by it by reason of such failure or. occurrence of such faults or obstructions. The cardinal rule governing courts in the interpretation of contracts is to ascertain the intention of the parties thereto, which intention is to be gathered from the words employed in the contract and not from any unexpressed mental intention which the parties may have entertained but which they did not express. Of course, in arriving at this intention, the entire contract must be looked into. Nelson Creek Coal Co. v. West Point Brick & Lumber Co., 151 Ky. 835, 152 S. W. 929; Gabbard v. Sheffield, 179 Ky. 442, 200 S. W. 940. Applying this rule to the lease in question, we find that the only clauses of that lease which help us in arriving at the intention of the parties as to the matter in dispute is the tenth clause itself, and probably the eleventh. The lower court in construing this tenth clause held, first, that the obligation to pay the minimum royalty of $100.00 a month, beginning January 1, 1919, was absolute, and that, so long as the lessee retained possession of the lease, it was obligated to pay that minimum royalty, even though there was a failure of workable coal of the minimum thickness provided for or the occurrence of faults or other obstructions in the mine without fault or negligence of the lessee. We do not so read the contract. It seems to us that the lease

plainly provides, if any time is lost by reason of any of the conditions stated in the proviso of its tenth clause, the obligation of the lessee to pay the minimum royalty is *pro tanto* suspended. The lessee is not obliged to surrender the lease on account of the existence of these conditions if it wishes to escape the payment of minimum royalties, as suggested by the lower court. In fact, it is very doubtful if the lessee has any right to surrender the lease unless in the opinion of the engineer of the lessor the contingencies provided for in the 11th clause of the lease come into being, and it is not claimed that the engineer of the lessor has ever entertained or given such an opinion. On the other hand, the very fact that the parties provided for a *pro tanto* suspension of the minimum royalty during the time lost by reason of the occurrence of the conditions set out in the proviso to this tenth clause proves that it was not the intention of the parties that the existence of these conditions should require either a cancellation of the lease or as the alternative the payment of the minimum royalty. In the case of Siler v. White Star Coal Co., 190 Ky. 7, 226 S. W. 102, this court had before it the consideration of a coal lease very similar to the one in the case at bar. In the lease in the Siler case there was a provision for a minimum royalty. By the ninth clause of that lease it was provided:

"It is further hereby agreed between the parties hereto that, if at any time the White Star Coal Company shall be prevented from carrying out any and all of the covenants of the leases under which it is operating, by reason of epidemics, riots, insurrections, strikes, wars, car shortages or by failure of workable supply of coal on premises of first parties and second party, or occurrences of faults or other obstructions in mines, or by reason of any other outside conditions over which the White Star Coal Company has no control, and which is without fault or negligence on the part of said White Star Coal Company, then the minimum royalty of $750.00, as above stated, shall be reduced in proportion to the time lost by said interruptions by said above named causes."

This clause is strikingly similar, if not exactly so, to the tenth clause of the lease before us. This court in the Siler case held that the lessee under the quoted clause of his lease was not obliged to pay the specified minimum

royalty each month if he lost time in mining by reason of epidemics, riots, insurrections, strikes, wars, car shortage or failure of workable supply of coal or occurrences of faults or other obstructions in the mine without fault or negligence on his part. We are unable to distinguish that case from this one. We therefore hold that if in the case at bar there were present any of the contingencies provided for in this tenth clause of the lease, then the lessee to the extent of the time lost by reason of the same was absolved from the payment of the minimum royalty.

This brings us to the question whether or not the evidence showed the existence of any of such contingencies. In the fall of 1917, W. S. H. Armistead, who had been in the real estate business in Nashville, Tennessee, was seeking an opening in some other line. He knew nothing of the coal business. He bought the lease here in question from Stone, its owner, and soon thereafter transferred it to the appellant, a corporation which he organized and of which he was the principal stockholder. He came in person to the location of the lease and went to live with or on the property of the appellee, in whom he seems to have had absolute trust and confidence. On appellee's representations that it was not necessary to procure an engineer, and on appellee's advice and suggestion that he open the coal mine at a place where appellee or some prior lessee of his had done some little work previous thereto, Armistead began work on this lease in accordance with such advice and opened a seam known as No. 4 coal. From that time until the latter part of March, 1921, the evidence shows without any doubt that appellant was earnestly striving to find a workable vein of coal that could be mined at a profit. During that period appellant invested between $10,000.00 and $15,000.00 in the opening of various seams, in driving entries and in development work, a great deal of which was done on the advice and under the supervision of appellee. However, during all of this time, although some little coal was gotten out at great expense, no real workable vein or seam was discovered. The maximum thickness of any seam found was between 29 and 30 inches and the coal was dirty. Several entries had to be abandoned and other entries were opened. Finally about the last of March, 1921, the appellant discovered a seam of coal known as No. 6, which it mined up to and including December, 1921, which is as far in point of time as this lawsuit goes. This seam which was discovered is thus described in the evi-

dence: First a 35-inch seam of coal which all parties admit to be good; then a parting composed of bone coal, fire clay, or slate, which varies in thickness but averaging six to eight inches; above this parting a seam of coal some ten to twelve inches in thickness. There is a sharp dispute as to the character of the coal above the parting. Appellant's witnesses describe it as very dirty coal, one witness saying it is slate which will burn but which cannot be marketed unless coal be scarce. On the other hand, appellee's witnesses testify that it is a good grade of coal, as good as the lower vein. It is agreed that in mining this coal it is necessary when the coal is shot to clean the coal of at least the dirt caused by the parting, and appellant contends that this causes great expense and renders it impossible for it to market this coal in competition with other coal in the vicinity. But there is evidence for appellee to the effect that this parting in the No. 6 seam is present in all of No. 6 coal in this field; that all coal companies have to and do clean the coal, and that it is universally considered in this field that coal similar to that found by appellant satisfies the requirement of a 36-inch minimum seam as provided for by appellant's lease. This court is in considerable doubt as to whether or not this seam of coal found is such a seam as satisfies the requirements of appellant's lease. In Holt v. Kelley, 224 Pa. 620, 73 Atl. 947, the court had before it a lease similar to the one in the case at bar and there was a controversy very similar to the one before us. That court held that the burden was on the lessee to show that the coal was of less thickness than that required by the lease in order to avoid the obligation to pay the minimum royalty. See also, note L. R. A. 1917E 1075. That being true, we have come to the conclusion that so far as this record shows, the appellant has failed to prove that from March, 1921, on there was an absence of 36-inch workable coal, and therefore its obligation to pay the minimum royalty attached at that time and continued down through December, 1921, the last date involved in this suit. But it is urged as the lower court held, that because this 36-inch vein was on the leased premises from the beginning of the lease, although not discovered until March, 1921, the lessee is obliged to pay the minimum royalty from January 1, 1919. However, we do not think this was the intention of the parties. The fact that the lease provided for a *pro tanto* suspension indicates that the parties understood and be-

lieved that a 36-inch minimum seam of coal might from time to time give out and be rediscovered or another like seam discovered, and that in the interim no obligation to pay the minimum royalty should be upon the lessee. We think that, where, as here, the evidence shows the lessee in good faith makes reasonable and diligent efforts to discover coal, the fact that he fails to discover it without negligence on his part, although it may be present on the premises, does not oblige him under a clause in a lease like the one here at bar to pay the minimum royalty until it is discovered. Hence the minimum royalty under the lease and facts before us did not begin to run until the latter part of March, 1921. Applying these principles to the dispute betwen the parties, we find that from March, 1921, until December, 1921, inclusive, there was earned as minimum royalty $918.35, to which must be added royalties actually earned on coal mined from the beginning of the lease to and including the first part of March, 1921, $1,051.66, making a total of $1,970.01 due the appellee, to be credited by the sum of $1,700.00 paid to appellee by appellant, leaving a balance of $270.01, for which judgment should be given appellee. As the lower court gave the appellee a judgment for $1,900.00, to the extent of the excess, the judgment is erroneous and is reversed.

The next cause of controversy arises over the cutting of timber on the leased premises both by appellant and appellee. The lower court gave judgment against appellant on this branch of the case in the sum of $84.00. To the extent of $80.00 appellant admits this to be correct, but states that it is unable to find why the court gave judgment for $84.00. No doubt the court did this on the testimony of appellant's witness, C. E. Howard, who first testified that appellant had cut without right eleven trees measuring 4,038 feet, but later admitted that there might also be two other trees which were cut measuring 350 feet. If one of these two be added to the amount admittedly cut without right and the agreed price of $2.00 per hundred applied, the figure of $84.00 as found by the court is practically arrived at. Appellant insists, however, that this sum should be credited by $30.00 for trees appellee cut without right. Appellee, however, had a right to clear and cultivate certain parts of the leased premises. In the absence of the many maps referred to in the evidence and which were not sent up to this court, we are unable to locate exactly where these trees appellee

cut were located and hence we are unable to say that the court erred in declining to give appellant any credit for this small amount. Therefore, so far as the cutting of timber is concerned, the judgment of the lower court is affirmed.

The last cause of controversy is concerning the extent of the lien which the lower court gave appellee to secure him in the payment of the moneys due him from appellant. This question is important, as appellant has gone into the hands of a receiver since the institution of this action. The 12th clause of the lease reads as follows:

"And it is distinctly understood and provided by and between the parties hereto that the lien of the lessors upon the property of the lessee on the premises hereby leased shall extend to all property and effects that come on said premises, or that are used by or belong to the lessee in running the business under this lease, to secure said lessors in the payment of the rents and royalties aforesaid, and to save harmless said lessors from any and all damage and loss that may accrue to them, or which they may suffer by reason of the failure of the lessee to keep any one of the above agreements and conditions of this lease, and no property shall be removed from the premises by him after such claim has accrued until same is settled; and at the conclusion of this lease the miners' houses and structures so erected on said leased premises by lessee shall attach to and become a part of the freehold, and title thereto shall pass to the lessors."

It appears that after appellant had started developing the leased premises it bought some adjacent real estate on which it has erected certain houses and placed certain property used in connection with the development of the leased premises. The lower court gave appellee a lien, not only on all of the property of appellant located on the leased premises, which was undoubtedly correct, but also gave him a lien on all the adjacent real estate so bought by appellant and on all of appellant's property located thereon and used in connection with the development of the leased premises. The 12th clause of the lease plainly stated, first, that the lien provided for shall extend to all property and effects that come on the premises covered by the lease. This necessarily means

personal property. This clause then goes on to provide, "or that are used by or belong to the lessee in running the business under this lease." Under the familiar principle of *ejusdem generis* we hold that this part of the 12th clause means the same kind and character of property first referred to, that is, personal property, and it does not cover real estate acquired afterwards by appellant. Therefore, the lien created by this clause of the lease covers only the property of the appellant located on the appellee's land and such other property, no matter where located, used by the appellant in carrying on the business of working the leased premises, provided such property be not real estate or so affixed to the realty as to be considered realty in the eyes of the law. To the extent that the judgment of the lower court gave appellee a lien in excess of this, it is erroneous and the judgment is reversed.

It is therefore the order of this court that the judgment of the lower court be reversed with instructions to render a judgment in accordance with this opinion.

The record in this case is very badly gotten up. Subdivision 3 of rule 5 of this court requires depositions to be copied in the order in which they were taken. The depositions in this case are copied in flagrant violation of this rule, rebuttal proof often appearing before proof which it rebuts, making it very confusing for this court to read. This court said in the case of Taylor Coal Co. v. Miller, 168 Ky. 719, at page 724, 182 S. W. 920, that all records for this court should be typewritten with a black record ribbon not worn or faded and on good weight paper, so that the matter will be easy to read. This record is largely typewritten on very thin paper, such as is used in making carbon copies, and it is very trying on the eyes to read it. Therefore, the record in this case is condemned, and to the extent of $50.00 the clerk will not recover his costs for making it.