## Pendleton v. Garrard Bank & Trust Co., et al.

(Decided June 5, 1925.)

### Appeal from Garrard Circuit Court.

1.  Banks and Banking—Loan Made by Bank for Depositor Held Ratified by Depositor's Transaction with Borrower.—Bank's violation of instructions in lending money, if any, held ratified by loaner's negotiation of extension of loan at increased interest when note first taken matured.

2.  Trial—Refusal to Submit Issue whether Bank had Violated Instructions in Making Loan of Customer's Money Held Not Error, where Evidence Established Customer's Ratification of Loan Made.—Refusal to submit issue whether bank had violated instructions in making loan of customer's money held not error, where evidence established customer's ratification of loan made.

3.  Trial—Refusal to Receive Testimony in Denial of Deposition Not Yet Read in Evidence Not Error.—Refusal to admit testimony, in denial of statement made by adverse party in deposition given prior to trial, which had not at that time been read in evidence, held not error, particularly where facts testified to, if true, were entirely inconsistent with statements made in deposition.

4.  Appeal and Error—Manner of Preparation of Records for Supreme Court, Stated.—All records for Supreme Court must be typewrit-

ten with black record ribbon, not worn or faded, by clean type-
writer keys, and on good weight paper, so that matter may be
easily read.

5.  Clerks of Court—Courts—Where Records for Supreme Court
    Written on Paper Too Thin for Court to Read with Comfort,
    Stenographer and Clerk Denied Fees.—Where clerk's record,
    transcript of evidence, and brief of counsel were all written on
    paper so thin that another piece of paper had to be interposed be-
    tween sheets before court could read with any degree of comfort,
    held, stenographer and clerk would be denied their fees.

PURYEAR & CLAY for appellant.

ROBINSON & KAUFFMAN for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirm-
ing.

In March, 1920, appellant herein had on deposit with
the appellee, Garrard Bank and Trust Company, at Lan-
caster, Kentucky, something over $4,000.00, and he was
anxious to invest these idle funds. Appellant is a man
of limited education, being able, as he says, to read print
with difficulty, and script not at all, and being unable to
make any arithmetical calculations beyond those of the
simplest kind. However, it is shown he is a shrewd
money maker in a small way and of that type of mind
which constantly sees flaws in what it has done and needs
to be reassured that it has proceeded correctly. He con-
ferred with appellee Elmore, the cashier of the bank,
regarding a suitable investment. He claims that he
insisted on a land note. Elmore, however, testified, and
in this he is borne out by the witness Hopper, that appel-
lant positively did not want a land note; that he first
offered appellant a certificate of deposit but as this bore
only three per cent interest and appellant desired a higher
rate, he declined it, and that he then suggested a land note
although remarking that it was a little late in the season
to get one. He claims that appellant also declined the
land note because land notes were of record at the court
house and so known to the assessor and appellant was
seeking an investment that would not be taxed against
him. Appellant's subsequent conduct with reference to
his assessments rather substantiate Elmore's testimony
in this regard. When appellant had declined, as Elmore
says, all of these suggestions, Elmore then told him that
he thought he could lend the money to the Lancaster

Flour Mill, a local corporation. Thereupon appellant inquired concerning its solvency and Elmore assured him that it was amply solvent, as were also its two owners, Spoonamore and Zanone. Appellant claims that he was given no specific figure concerning the assets and liabilities of either the mill or its owners. Elmore on the contrary claims that he did give appellant a financial statement of this company and these individuals. But be that as it may, the evidence overwhelmingly and really without dispute discloses that at this time both the mill and its owners were amply solvent and good for a loan of many times the amount of $4,000.00. At appellant's request, Elmore called up the mill and found out that they could use the money, and then he made out a check payable to the mill and a note payable to appellant. Appellant claims that he signed the check and left both papers with Elmore for him to get the signature of the mill to the note which he thought was going to be a land note. Elmore claims that he gave the check and the note to appellant and the latter took the papers down to the mill for signature. On this issue, the great weight of the evidence is with appellant as he is borne out by Spoonamore and by subsequent developments. Instead of the mill signing the note Spoonamore signed the note individually. So far as financial responsibility is concerned, the note was probably better with Spoonamore's individual signature than it was with that of the mill. The check was then endorsed by the mill by Spoonamore and then by Spoonamore individually, and the proceeds placed by the bank to his credit. There is no intimation that Spoonamore did anything wrong in this connection as he was using his private funds to finance the flour mill, and the purchase of wheat at this time required a good deal of ready cash. After the note had been thus signed, it was left with Elmore at the bank and he placed it with the other papers of appellant in a wallet where the papers of customers of the bank were kept. Elmore says that appellant thereafter, about once a month, came to the bank and looked over his papers and that at least on one occasion the note was read by him to appellant and that the latter knew all along that the note was Spoonamore's note and not the mill's note. Appellant denies this, but as we shall point out, his own evidence contradicts him on this point. In the early part of February, 1921, appellant, having the idea that it was necessary to give the

maker of a note notice that it was falling due in order to collect, came to the bank to see Elmore about sending such notice. Elmore asked him why he was going to collect in his note, and appellant first stated that he was going to buy some land. Elmore advised against such purchase, as land values at this time were on the verge of tumbling from the high prices which prevailed during and immediately after the war. Appellant then said that if he did not collect in his money, he ought to get a higher rate of interest, and again inquired about the solvency of the maker. His testimony is replete with evidence showing that he then knew Spoonamore was the maker on this note. For instance, in answer to question 44 he says:

"He (Elmore) advised me to run it on, said would be same care took of me as was of themselves taken at the bank, and I asked him, way the thing come up, my brother had one on same man, too, and I asked him why he put both on same man. He said because the man was good, that he had 318 acres of land at the edge of town and a mill and everything, and some other stuff, and he was perfectly good, and that was all that was over it at that time."

He repeats this statement again in answer to question 74, and in substance again in answer to questions 106 and 107, and numerous other places through his testimony. Thus he makes it perfectly clear that he thoroughly understood at this time that it was Spoonamore who was the maker of this note; and hence it is plain that even if he did instruct Elmore in March, 1920, to lend this money to the mill and thought then that Elmore had so done, yet by February, 1921, he knew that Elmore had violated instructions and lent the money to Spoonamore instead. It is true that Elmore in this February, 1921, conversation again assured appellant of the solvency of Spoonamore; but we do not find in the record any testimony that Elmore was not perfectly *bona fide* in making this statement, or that in fact it was not true. On the contrary, the evidence indicates that these statements were true. Appellant then went to see Spoonamore about collecting his interest and demanded for the coming year seven per cent instead of six per cent. Spoonamore, not knowing appellant, as he says, declined at that time to pay him the interest then due, and stated that he would have to see Elmore to find out if appellant was

the one to whom he was indebted. This was satisfactory to appellant. Spoonamore then consulted and learned that appellant was his creditor. He also at this time asked Elmore's advice as to whether or not he ought to pay seven per cent for the coming year. As interest rates had advanced in that community, Elmore advised him to do so if he wished to keep the money. A few days later appellant again went to the mill and there received a check of the mill not only for the past year's interest but also for one per cent for the coming year in advance, the remaining six per cent to be paid when the year was up. It is clear that in making this transaction, appellant ratified the loan theretofore made to Spoonamore. The fact that he received the mill's check for the interest does not militate against this conclusion as the mill and Spoonamore were practically identical; Spoonamore was using his private funds in the support of the mill, and, as we have shown appellant well knew that it was Spoonamore's note he was holding at this time, and it was on Spoonamore's solvency rather than the mill's he was then relying. Shortly after the conversation between Elmore and appellant in February, 1921, Elmore's bank took a mortgage on the mill property, Spoonamore's property and Zanone's property, as security for loans the bank had theretofore made to them. It is sought to give a sinister aspect to this transaction, but Elmore explains that these loans had theretofore been on open credits; that the banking commissioner would not permit the bank to lend any more money to the mill or Spoonamore without having this past indebtedness secured, because so to do would permit the bank to exceed the limit which under the banking laws it could lend taking into consideration its capital stock and surplus, and that as the season for buying wheat was fast coming on, during which time the mill would need large accommodations, the bank was preparing itself to make these accommodations. The record shows that the bank did thereafter lend a large sum of money on open credits to the mill, practically all of which was lost in the subsequent financial crash. Later in the year after wheat and land values had dramatically declined, Spoonamore and Zanone went into bankruptcy. It is not quite clear from the record that the mill also went into bankruptcy, but it is fairly clear that it, too, was insolvent. Appellant having proved his claim in the bankruptcy proceedings of Spoonamore

and having received by way of dividend only twelve per cent thereon, brought this suit against Elmore and his bank to recover the value of his note less the credits. He based his claim on the ground that Elmore individually and as agent of the bank had wrongfully and fraudulently and in violation of instructions lent this money on personal security instead of a land note; had misrepresented to him the solvency of the obligor on the note and had deceived him into making the loan. On a trial before a jury a verdict was rendered in favor of the appellees and from that judgment, appellant prosecutes this appeal.

In this court appellant relies for a reversal on errors in the instructions and on exclusion of testimony offered by him. The court gave but one instruction and appellant's complaint about it is that it fails to submit to the jury whether or not Elmore had violated instructions wrongfully or fraudulently in lending $4,000.00 to Spoonamore in March 1920, instead of to the flour mill. As we have above pointed out, whether Elmore did this wrongfully or fraudulently or not in March, 1920, is beside the question in this case, because conceding all appellant claims on this point to be true, yet it is plain from appellant's own testimony that in February, 1921, he knew what kind of a note he had and with this knowledge he extended it for an additional year at an advanced rate of interest. Under such circumstances it is elementary law that appellant ratified any departure from instructions that Elmore may have committed in March, 1920. Therefore, there was no issue on this point to submit to the jury and the court did not err in refusing to instruct upon it. So far as the rest of the appellant's case is concerned, it was pitched on fraud and deceit and though it is exceedingly doubtful whether or not the court should not have instructed the jury peremptorily for appellees, yet if there were any questions on this branch of the case for the jury to decide they were submitted properly by the court in an instruction which, with the exception hereinbefore discussed, is not complained of in this appeal. We find no merit in the first contention of appellant.

It is next insisted that there was error in the rejection of testimony offered by appellant. Appellant on his direct examination sought to deny a statement made by Elmore in a deposition given prior to the trial of the case, and which at the time appellant was being interro-

gated had not been read in evidence. Neither had Elmore then testified. It is obvious that this was an attempt to contradict testimony which had never been given, and of course the court properly excluded it. We may add, however, that appellant testified to facts in his evidence which, if true, were entirely inconsistent with the statements made by Elmore in his deposition, and which appellant wished to deny. Hence there is no ground for reversal on this score.

Perceiving no errors prejudicial to appellant's substantial rights, we are of opinion that the judgment of the lower court should be affirmed, and it is so ordered.

In this state, we do not require the printing of the record or briefs for this court. To expedite the labors of this court, we have laid down certain rules which govern the makeup of records and briefs. If these are not made up according to these rules much additional and at times painful labor is placed upon the court, which the party litigant has no right to ask. It has long since been a rule, to which the clerk and official stenographers have had their attention called time and time again, that all records for this court must be typewritten with a black record ribbon not worn or faded, by clean typewriter keys, and on good weight paper, so that the matter will be easy to read. See Taylor Coal Co. v. Miller, 168 Ky. 719, at page 724, 182 S. W. 920; Muncey Coal Mining Company v. Muncey, 206 Ky. 638, 268 S. W. 293.

In this case the clerk's record, the transcript of the evidence, and the brief of counsel for appellees are all written on paper so thin that another piece of paper had to be interposed between the sheets before the court could read them with any degree of comfort to its eyes. This is in flagrant violation of the rule, and for that reason the brief of counsel for appellees is stricken from the record; the stenographer who made the transcript of the evidence will not be permitted to collect $25.00 on her fees, and if she has collected them she will to that extent make refund to whom it may be due; and the clerk will not be permitted to recover $5.00 on his fees, and if he has been paid, he will repay this amount to the person entitled thereto.

Judgment affirmed.