## Hall et al. v. Eversole's Adm'r et al.

(Decided June 9, 1933.)

(As Modified on Denial of Rehearing Dec. 8, 1933.)

WM. SAMPSON and E. H. JOHNSON for appellants.
EDWARD C. O'REAR and ALLEN PREWITT for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

This is a suit in equity under the Declaratory Judgment Act (Civil Code of Prac. secs. 639a-1 to 639a-12) to have ascertained the rights of the lessor and lessees under two leases of coal lands in Harlan county, Ky.; the first being dated November 14, 1922, and which will hereafter be referred to as the 1922 lease; and the sec-

ond, supplemental to the first, being dated March 9, 1929, and which will hereafter be referred to as the 1929 lease. This suit was originally brought by G. A. Eversole, who died during its pendency; the action being revived in the name of his son, Virgil Eversole, as the administrator of his father's estate. By the 1922 lease, G. A. Eversole, as the first party, and John M. Pope, F. F. Cawood, Henry Pope, and W. F. Hall, as the second parties, the wives of all of these individuals joining with them, entered into a lease contract, the purpose of which was to pool a tract of land underlain with coal owned by Eversole on Martin's fork with a tract of land owned by the second parties and adjoining the land of Eversole; the pooled tracts to be operated by the second parties as a unit in a coal mining operation. By the terms of this lease, Eversole leased his land containing 321 acres to the second parties whose land to be pooled with his comprised 865 acres. The term of the lease was 25 years with a fixed annual rental of $3,000, together with taxes and other charges set out in the very lengthy lease evidently drawn with care and thought. The lessees were then operating under the firm name of Ellis Knob Coal Company and to it they assigned this lease as they had a right to do. The lease granted to the lessees the exclusive right for the period of the lease to mine and remove the coal from under the lessor's land. The lessees also had the right to use the surface for tramways, railways, roads, buildings, dwellings for miners, tipples, etc., and to deposit refuse material from the mines. It contained many other provisions such as are usually found in these mining leases. Many of such provisions are not pertinent to the present controversy and hence will not be noticed in this opinion. The seventh clause of the lease provided:

"The lessees covenant and agree to pay to the lessor for the use and enjoyment of the premises hereby leased for the purpose aforesaid, irrespective of the amount of coal mined, a certain yearly rental of $3,000.00, payable in monthly installments of $250.00 each, at the office of the lessor at Harlan, Kentucky, on the 20th day of each calendar month succeeding the month for which the rent is due, the first monthly installment to become due and payable on the 20th day of October, 1922."

Other provisions in the lease provided that this fixed rental was to be credited by royalties paid on the coal actually mined, the royalty to be paid on all coal mined from the pooled premises, irrespective of whether it came off the Eversole tract or the land owned by the second parties. The lease also provided that the royalty to be paid for coal taken from the pooled premises should be 15 cents per ton on coal mined and not coked. It was further agreed by the lease that before any mining operations should begin on any particular seam of coal, the parties should agree as to, or by arbitration have settled, their respective acreage of that particular seam of coal to be mined. In this connection, the 1922 lease set out that the parties had agreed that the Harlan seam which was to be mined underlay 217 acres of Eversole's land and 371 acres of the second parties' land, which being true, the 15-cent royalty on this Harlan seam was to be divided so that Eversole was to get 5½ cents of it and the second parties the rest; the 5½ cents being that proportion of the 15-cent royalty which Eversole's acreage of Harlan seam bore to the total acreage of that seam pooled. The fourteenth clause of the lease in part provided:

"The working by the lessees of the mines on the leased premises shall be governed by the following regulations:

"1. The lessees shall work and mine the coal on the leased premises in the most diligent, effectual and suitable methods of current mining, and in conformity also with all the laws and all regulations made by authority of law which may from time to time be in force in respect to the working of coal mines and the safety of employees therein.

"2. The lessees shall drive the regulation size of gangways and airways through such portions of any vein as may prove faulty or may not yield merchantable coal.

"3. The lessees upon abandoning any room, opening or other working shall pay to the lessor royalty at the rate herein reserved upon all coal left and in which in consequence of such abandonment cannot thereafter be economically mined, provided, however, that if the lessees shall before such abandonment give the lessor reasonable notice

thereof, the engineer of the lessor shall thereupon inspect such room, opening or other working, and if said engineer shall decide, or if the lessees shall not agree with his decision and shall thereafter and without delay secure an award of arbitrators, that all or any of the coal so left is necessary for proper security and is unmerchantable (and has not been rendered unmerchantable by any act or default of the lessees or by any cause for which the lessees are responsible) then the lessees shall be released from the payment of royalty upon so much of said coal as is so determined to be necessary for security or unmerchantable.

"4. If any coal in any vein on the leased premises shall become unmerchantable or be lost by any squeeze, creep, lifting of the bottom or other cause resulting from improper methods of mining practiced by the lessees, or if any coal shall at any time before use or shipment become unmerchantable or be lost through the fault or negligence of the lessees, the amount thereof shall be determined by arbitration and upon the report of the arbitrators, the lessees shall forthwith pay to the lessor royalty at the rate herein reserved upon every ton of merchantable coal which, according to said report, has been so rendered unmerchantable or lost."

The thirty-third clause of the lease has reference to arbitrators. After setting up the machinery of arbitration, it provides in subsection 3 as follows:

"3. The following matters shall be submitted to arbitration hereunder:

"a. All matters hereinbefore specifically referred to arbitration.

"b. All questions of quantity, quality, value or amount of loss or damage.

"c. All questions of mining or lumbering practice.

"d. All disputed questions of fact arising under this lease."

The second parties immediately on the execution of this lease began the operation of the pooled premises through the Ellis Knob Coal Company, the corporation they had organized and to which they assigned

this lease. This company operated the pooled premises until 1926, when the lease was assigned to the Crummies Creek Coal Company, which continued to operate the mine up to March, 1930. During all of these years, so far as this record shows, the pooled lands had been mined only for the Harlan seam. Some time prior to March, 1929, the Hall estate (the generic name found in this record for the second parties, especially after the death of Judge W. F. Hall) had acquired two tracts of land, both of which adjoin the lands pooled by the 1922 lease. They are known as the Hedrick tract and the Kentenia tract. There had been some operation of these Hedrick and Kentenia tracts as a part of the pooled premises and coal had been hauled out from these two tracts over part of the Eversole land, for which Eversole was entitled to a haulage fee. It also seems that Eversole had been paid the 5½-cent royalty due him for coal taken from the Harlan seam on the pooled land on the coal taken from this Hedrick tract, and possibly on some taken from the Kentenia land. Higher up in the mountain than the Harlan seam is a seam of coal known as the Darby seam, a very valuable coal for by-product purposes. About 1927 or 1928, the Crummies Creek Coal Company became quite anxious to get into the mining of this Darby seam, not only on the land that had theretofore been pooled by Eversole and the Hall estate, but also on the Hedrick and Kentenia tracts. Negotiations were opened between the Hall estate prompted by the Crummies Creek Coal Company and Eversole looking to the addition of the Hedrick and Kentenia tracts to the lands originally pooled; all of the tracts so proposed to be pooled to be operated not only for the Harlan seam but also for the Darby seam of coal. These negotiations were finally consummated in the 1929 lease, which in form was a supplement to the 1922 lease. By this 1929 lease, Eversole surrendered whatever claims he had for the haulage of coal theretofore had over his land from the Hedrick and Kentenia lands, and the Hall estate surrendered whatever claim it had against Eversole for the alleged mistaken payment to him of royalty on coal taken from these two tracts. The parties then agreed to pool all the tracts, the land theretofore pooled and the Hedrick and Kentenia tracts; the lessees to mine the Harlan and Darby seams in the pooled tracts. Eversole's royalty on the Harlan seam was to be reduced to

4 cents. The area of the Darby seam under his land was determined and its proportion to the total acreage of the Darby seam in the pooled lands fixed, which being done, his part of the royalty for the Darby seam was set at 5.14 cents per ton. The fixed rent on the lease was raised from $3,000 to $5,000 per year. Following these provisions, there appeared these clauses:

"The second parties agree to mine not less than 40,000 tons of coal from the Harlan seam of coal during each year during the life of the lease.

"It is agreed that after all of the coal has been removed from the Darby seam or which should be recovered from said seam in the exercise of diligence in mining same, the fixed rent shall be $3,-000.00 per annum, payable in monthly installments as aforesaid thereafter."

Except as modified by the 1929 lease, the 1922 lease was reaffirmed in all its parts.

On March 4, 1930, the Hall estate being thereto prompted by the Crummies Creek Coal Company, who executed a bond of indemnity to hold the Hall estate harmless against any liability to Eversole because of what is now about to be set out, wrote a letter to Eversole, the substance of which was to notify him that the Harlan seam of coal in the pooled lands and especially under Eversole's land had become unmerchantable and could not be economically mined, by reason of which the abandonment of that seam was necessitated. They further notified him that in the event he did not acquiesce in this conclusion of the Hall estate, he was called upon to arbitrate the question. A second notice of like tenor was sent to Eversole. He then inquired under what particular clause of the lease the Hall estate judged that it could demand an arbitration of the question raised by its notice. The Hall estate not answering this inquiry, Eversole brought this suit to have determined whether or not under the 1922 lease as modified by the 1929 lease he was entitled to continue to demand the fixed rental of $5,000 per year; whether or not the Hall estate was bound to continue with due diligence the mining of coal from the Harlan seam under his land during the term of the lease and to keep the mine in condition for use; whether or not the Hall estate was bound, in addition to the fixed rental of $5,-000 a year, to pay him an additional royalty of 4 cents

a ton, on 40,000 tons each year; whether or not the Hall estate could abandon the Harlan seam under his land over his protest and yet continue to mine the Darby seam; and, lastly, whether or not the Hall estate was entitled to insist that the dispute between it and him should be submitted to arbitration. The trial court held that the Hall estate was required to pay the fixed rental of $5,000 a year from March 9, 1929, on; that it was the duty of the Hall estate to mine the Harlan seam of coal under Eversole's land during the remainder of the 25-year period of the lease, or during so much thereof as said Harlan seam persisted in substantially the same thickness of the vein and of substantially the same quality as known or existed on March 9, 1929, it being expressly determined that such seam did at the time of the judgment substantially so persist; that the Hall estate was not obliged to pay Eversole the royalty of 4 cents a ton on 40,000 tons of Harlan seam coal in addition to the fixed rental of $5,000 a year, but that the royalty from the Darby seam should be credited on said fixed rental of $5,000 a year only to the extent of $3,400; that the dispute here involved was one not subject by the terms of the leases to arbitration; and, lastly, that the Hall estate should pay all the costs incurred in the prosecution of this suit. All other questions were reserved. From this judgment, the Hall estate has appealed, and the Eversole estate has prosecuted a cross-appeal from so much of it as denied it the royalty of 4 cents a ton on 40,000 tons in addition to the fixed rent of $5,000 a year, and because the trial court did not adjudge that the Eversole estate was entitled to the full royalty of 15 cents on all the coal from the Harlan seam hereafter taken out from under its land.

The grounds for reversal relied upon by appellants on the original appeal may be classified under two categories: A, procedural; B, to the merits.

A. Procedural. In this category we find five complaints of the judgment which we shall dicuss.

The first one is that this case was partially tried at a special term called by a special judge who was not a regular circuit judge, but appointed from the bar and completed at an extension of the term during which the trial of the case had been entered into. It is argued that a special judge has no authority either to call a special term of court or to extend the term of a court

over which he is presiding, and that hence the trial of this case was void. Appellants rely upon the case of Tye v. Tinsley, 204 Ky. 219, 263 S. W. 743, which held that under the act of 1924 (chapter 33, Acts of 1924) a special judge appointed from the bar pursuant to its provisions had no authority to call a special term of court. The act of 1924 was repealed by the act of 1926 (chapter 31, Acts of 1926), which now appears in sec-sections 971-1 et seq. of the Kentucky Statutes, 1930 Edition, and which as amended in particulars not here important by chapter 61 of the Acts of 1932 appears with like section numbers in the 1933 Edition of the Statutes. The rights of a special judge appointed from the bar to call special terms or to extend a regular or special term over which he is presiding must now be measured by the provisions of the 1926 act, which radically differs in its wording from the 1924 act. Prior to chapter 3 of the Acts of 1910, the authority to appoint special judges from the bar was to be found in section 971 of Carroll's Statutes, 1903 and 1909 Editions. That section in part read:

"The judge so appointed [i. e. the special judge] shall have all the powers of the regular judges."

In construing this provision of section 971, this court, in the case of Commonwealth v. Carnes, 124 Ky. 340, 98 S. W. 1045, 1046, 30 Ky. Law Rep. 506, specifically held that a special judge appointed from the bar pursuant to the provisions of section 971 had the power to call a special term to try the case which he was designated to try because of the disqualification of the regular judge. We said:

"It was not necessary that the regular judge of the district should call the special term. He had declined to sit in the cases at all. The special judge, by section 971, Ky. St. 1903, is given all the power of the regular judge. He is simply substituted for the regular judge in the cases referred to, and may call and hold a special term, just as a regular judge could hold it."

By a parity of reasoning, such special judge could extend the term at which he was trying a case, at least for the purpose of completing that trial. Further, in the case of Sublett v. Gardner, 144 Ky. 190, 137 S. W. 864, in construing the powers of the special judge appointed from the bar under this same section 971 of the

Statutes, we held in effect that although such a special judge could not render judgment except during a regular or special term of court, he could call a special term to render his judgment in the same manner as a judgment could so be rendered by a regular circuit judge. In the case of Dial v. Commonwealth, 143 Ky. 118, 136 S. W. 139, may be found a history of the repeal of this old section 971 of the Statutes and the substitution therefor of chapter 3 of the Acts of 1910, wherein the regular circuit judges of the state became the special judges; appointments from the bar being done away with. In 1924, the Legislature thought it desirable to restore the system of appointing members of the bar as special judges as a complement to the system of the regular circuit judges acting as special judges. Under this act of 1924, the powers granted such a special judge were not as broad as they were in the old section 971 of the Statutes. Under the old section such special judge had all the powers of the regular judge, unrestricted by any qualifying clause, but under the 1924 act such special judge had all the powers of the regular judge but only for the purpose of holding the term or a special term or of trying the case for which he had been designated. Under such restrictive language, the case of Tye v. Tinsley, supra, was decided as it was. The provisions of the 1924 act were found not to be flexible enough, and so in 1926 the 1924 act was repealed and a new and comprehensive system for appointing special judges from the bar was adopted. The language of old section 971 was restored and such special judges were vested with all the powers of the regular judge, unrestricted as such powers had been by the 1924 act. This broad language was not changed by the 1932 amendment to the 1926 act. We are of opinion that, just as the Carnes Case, supra, construed the like language in the old section 971 of the Statutes, the language of the 1926 act meant to invest the special judge with broad powers to the end that a flexible system and one adapted to modern needs might be inaugurated. Of course, this does not mean that where a special judge is designated simply to try a certain specific case he may usurp the functions of the regular judge as to all the rest of the docket, but in so far as the case to try which he is designated is concerned, he has just as much power with reference to it as the regular judge would have were he trying it. It then follows that the special

judge appointed from the bar may call a special term to try cases which he was designated to try and may extend the term during which he is trying such case in order to complete the trial. In the instant case, we find that after the special judge designated by the Chief Justice to try this case had called a special term to try it, the regular circuit judge of this district also called a special term of court in which this case was pending to be held during the period as that provided for in the call of the special judge. In his call for this special term, the regular circuit judge designated as one of the cases to be tried during it the instant case. The regular circuit judge not being able to hold this special term of court, the Honorable O. T. Hinton of Pikeville was designated as special judge to hold such term of court. Judge Hinton declined to sit in the instant case and thereupon the Honorable Grover G. Sales who, as special judge, had called this special term of court to try this case, was redesignated, under the 1926 act as it stood prior to the 1932 amendment, by the Chief Justice as the special judge to try this case. This he did, entering into the trial at such special term and completing it at the extension of such term, extended by him for the purpose of completing the trial. Thus we see that Judge Sales not only under his power as a special judge, but also because the regular circuit judge had called a special term to try certain cases, among which was the instant one, rightly entered into the trial of this case when he did; and, as we have seen, he had authority in order to complete the trial to extend the term at which the case was being tried for that purpose. There is no merit in the first complaint of the appellants.

The next complaint is that the case did not under the Code provisions as to time of trial stand for trial at the time when the special judge tried it. The case had been pending for a year and a half at the time it was tried. Aside from the fact that the real issues in this case had been or should have been completed thirty days before the commencement of the term when this case was tried (see section 367a-5 of the Civil Code of Practice) it must also be remembered that this was a suit under the Declaratory Judgment Act, section 3 of which (Civil Code Prac. sec. 639a-3) in part provides:

"And insofar as a declaration of rights is the re-

lief asked, the case may be docketed for early hearing as in the case of a motion.''

This vests the trial judge in such state of case with a discretion to set a case for early hearing where, as here, a declaration of rights is the relief asked. Clearly there was no abuse of discretion here in trying the case when it was tried. It had been pending a year and a half. Counsel for appellants had taken advantage of all delays allowed by the law to put off its hearing. The real issues in the case had been made up long before the term at which this case was tried began. Some amendments were filed and motions made just before and even during the trial, but they did not serve to introduce any real new issue but only presented the issues already formed in different fashion. The case was tried orally and there is no showing here that the appellants could have produced any further evidence on the issues formed had the case been continued. Indeed, their proof shows they were ready to try the issues as formed. The rules of the Harlan circuit court as to time of trial cannot override Code provisions with reference thereto. Dorman v. Wheeler, 244 Ky. 628, 51 S. W. (2d) 941. We are convinced there is no merit in this complaint of the appellant.

The next complaint is that the trial court erred in refusing to grant the appellants a continuance on account of the absence, due to illness, of Mrs. Lucy Hall, the administratrix of the Hall estate, and a party to this litigation. As we shall presently see, this case on its merits turns on two questions: (a) Whether the provisions of the lease required an arbitration of the differences here existing between the parties; and (b) whether under the terms expressed or implied of the lease the appellants had a right to abandon the Harlan seam under the Eversole land in 1930 because of its then condition. Save and except as to the condition of the Harlan seam in 1930, all these questions were those of law. So far as the condition of the Harlan seam was concerned, Mrs. Hall knew absolutely nothing about it. The parties to the litigation who could because of their knowledge and experience aid and assist counsel for the appellants were present and did render such assistance. Although Mrs. Hall had the privilege of testifying in this case and although the record establishes that her health was such during the trial which took considerable

time that she could have appeared and testified, she never did. We are convinced there was no prejudicial error committed in overruling the request for a continuance based on her absence.

The next complaint is that the trial court erred in refusing to grant appellants an issue out of chancery on the question of the condition of the mine and Harlan seam in 1930. The substance of the appellants' case was based on a claimed right to a cancellation at least pro tanto of the lease. Cancellation by the court of a contract being equitable in its nature, the court was not required to submit an issue of fact on which the right to cancel is based to a jury. Cf. Goodloe v. McLanathan, 6 T. B. Mon. 310, and Wood's Guardian v. Inter-Southern Life Insurance Co., 224 Ky. 579, 6 S. W. (2d) 712.

The next complaint is that the court erred in putting the burden of proof on appellants, but under the case of Muncey Coal Mining Co. v. Muncey, 206 Ky. 638, 268 S. W. 293, this was properly done. There are other minor complaints, but they are so lacking in merit as to require no discussion.

B. To the merits. In this category, we find two contentions. The first is that under the terms of these leases read together, the controversy here as to whether or not the appellants had the right in March, 1930, to abandon the Harlan seam was one that should have been submitted to arbitration, especially when arbitration was demanded by the appellants as it was. Appellants rely for their right to an arbitration on the provisions of clauses 14 and 33 of the 1922 lease hereinbefore set out. An examination of the various subsections of clause 14 of the 1922 lease discloses that they apply, first, to an abandonment of a particular room or opening or working, and, secondly, to coal in some particular vein or mined that has been lost or rendered unmerchantable by some act, fault, or neglect of the lessees. This clause does not in any way refer to the question of the abandonment of an entire mine or even of an entire particular kind of seam of coal. So far as clause 33 of the lease is concerned, its various subsections plainly refer to arbitration of questions of details of management, questions of quantity, value and mining practice, and questions of fact arising under the

specific provisions of the lease. They too do not contemplate an arbitration on the major question as to whether or not the mine or an entire particular kind of seam of the mine may be abandoned. It follows that the contention of the appellants that they were entitled to an arbitration of the dispute as to their right to abandon the Harlan seam in 1930 cannot be sustained.

The second contention is that the evidence showing that the Harlan seam under the pooled lands and especially under the Eversole tract had in March, 1930, become exhausted at least so far as being merchantable, the appellants were entitled to abandon that seam under the implied condition that where the performance of a contract is based upon the continued existence of a giving thing, the existence being assumed as a basis of the contract, performance is excused when existence fails. In the instant case, the leases of 1922 and 1929 demise to the lessees the coal under the Eversole land. These leases particularize the Harlan and Darby seams. The lessees by these leases bound themselves to mine these seams. To escape their obligations, they must show, not that it has become financially onerous upon them to perform that obligation, but that the subject-matter of the contract whose continued existence was impliedly assumed as the basis of the contract has become nonexistent. Laurence E. Tierney Land Co. v. Kingston-Pocahontas Coal Co., 241 Ky. 101, 43 S. W. (2d) 517, where may be found a discussion of this question and a collection of the authorities. The evidence in this case does not establish that the Harlan seam under the pooled lands or under the Eversole tract has become exhausted. Even the appellants' evidence leads to the conclusion that dirty as they claim the seam to be, and bad as they contend the mining conditions are, the main reason for their inability to profitably mine this Harlan seam is the present low price of coal. Even the appellants' evidence establishes that the condition of the Harlan seam and the mining conditions as they claim them to be in March, 1930, was no different from those conditions as they knew them to be when they entered into the 1929 lease. The seam as to kind, quality, and quantity has not changed from what it was when the 1929 lease was entered into. The subject-matter of the contract, the Darby seam (concerning which there is no dispute), and the Harlan seam, has not become non-

existent. The existence of these seams which was impliedly assumed as a basis of the contract was the same in March, 1930, as it was in March, 1929. Since the appellants had to establish that the subject-matter of the contract impliedly assumed had become nonexistent, and since the evidence establishes exactly the contrary, they cannot escape their obligations under the contract to mine this Harlan seam, there being no express provision in the contract authorizing them to do so, simply because they cannot now profitably mine that seam. This case cannot be distinguished from the Tierney Case, supra, which held the lessees of a coal mining lease to the performance of their obligations under their lease despite their contention that the coal, which was the subject-matter of the lease, could no longer be profitably mined because of its condition and of the mining conditons; the coal being of the kind, quality, and quantity as it was known to be when the lease was entered into. The trial court did not err in adjudging that the appellants had no right to abandon the Harlan seam in March, 1930, and that they were obligated by their contract to mine a minimum of 40,000 tons a year of such coal.

On the cross-appeal, it is argued first that the trial court erred in adjudging that the fixed rent of $5,000 a year was to be credited by the royalty on the 40,000 tons of the Harlan seam which the lease obligated the lessees to mine yearly; it being appellees' claim that this royalty should be in addition to the fixed rent of $5,000. Clauses 8 and 11 of the 1922 lease in part provide:

"The lessees agree to pay to the lessor, or order, at his office in Harlan, Kentucky, on the 20th day of the month succeeding the month in which the coal is mined or coke made, the proportion of said royalties as above specified that the acreage of the coal seams from which the coal is mined on the land of lessor bears to the acreage of said coal seams on the land of the lessees, less the amount of fixed monthly rental paid as provided for in paragraph 7th hereof."

"If in any year the royalties shall not equal the rental for such year, and the lessees shall have paid during said year the monthly installments of rent when due, as provided by paragraph 7th, the

lessees shall have the privilege, during the next succeeding two years, but not thereafter, of mining free from royalty such amount of coal over and above the amount which would produce royalties equal to the amount of such excess of rent paid, but nothing herein shall be construed so as to relieve the lessees from paying the monthly rental for such year or any year.''

The 1929 lease did not undertake to abrogate these provisions of the 1922 lease. It simply raised the fixed rent from $3,000 a year to $5,000, readjusted the rate of the royalty to be paid on the Harlan seam, and fixed the proportion of the royalty to be paid Eversole on the Darby seam. Then in part to insure that the fixed rent would not be fully discharged by credits of royalty from the Darby seam, the lease provided that 40,000 tons of Harlan seam was to be mined yearly. The provision as to the mining of the Harlan seam was also to insure the keeping up of the mine, the abandonment of which would no doubt result in the utter loss of the Harlan seam not mined. The parties themselves so construed these leases as to crediting the fixed rent with the royalty from the 40,000 tons of Harlan seam to be mined yearly. Virgil Eversole so admits in his testimony. We find no error in the court ruling adverse to appellees' present contention on this score.

Appellee next contends that he is entitled to the full 15 cents royalty on the Harlan seam hereafter mined. He bases this contention on the fact that appellants' claim that the Harlan seam in the lands pooled with the Eversole tract had also become exhausted in March, 1930, and that since the division of the royalty was based on the assumed acreage of Harlan seam under each of the pooled tracts, and there is no Harlan seam under the Kentenia or Hedrick tracts, that the division was made under a material mistake and that he is entitled to have that mistake corrected. This question was not passed on by the trial court which, by its judgment, expressly reserved for further consideration all matters respecting the rights and duties of the parties not decreed or declared in its judgment. Hence it is not before us at this time for adjudication and we pass no judgment upon it.

The foregoing being our views, the judgment is affirmed on both the original and cross appeals.