## The O. K. Jellico Coal Company v. L. L. Parks and L. M. Parks.

### (Decided February 8, 1912.)

### Appeal from Laurel Circuit Court.

Mines and Mining—Coal Mining—Inferior Quality of Coal—Abandonment by Company.—The evidence in this case shows that the coal taken from this mine was of an inferior quality, that the company diligently operated it, but by reason of the inferior quality of the coal it could not compete in the market with other coal, and could only be sold with difficulty and at a reduced price. The mine was at all times worked under the management of competent men and the failure of the company to make it a success was from the fact that the coal was not of a good merchantable quality. Held, that when it was thoroughly demonstrated that the mine could not be made a success the company was absolved from further liability to work it, and we are satisfied from the pleadings and proof that appellees were not entitled to recover anything, and their petition should have been dismissed.

BURTON VANCE, JAMES R. DUFFIN and W. L. BROWN for appellant.

GEO. G. BROCK, SAM C. HARDIN for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

L. L. Parks and his wife are, and were prior to 1902, the owners of a farm in Laurel County, Kentucky, upon which there is a coal mine. They gave a lease to one Eldridge upon one hundred and fifty acres of this land, and through his efforts a company was organized in the fall of 1902, known as the O. K. Coal & Coking Co., for the purpose of developing the property upon which he held the lease. The lease was assigned to this newly organized company, and it commenced business with Eldridge as manager. It appears that, before he procured the lease, coal had been mined to some extent from this property by a company known as the Lily Mining Company, of which L. L. Parks was president and Eldridge was manager. The business was prosecuted by the O. K. Coal & Coking Company under the management of Eldridge until some time in June, 1903, when the resources of the company were exhausted, and it became necessary to increase the capital stock. This was done, and, by a sale of the new stock, $30,000 additional was put into the business. The name was changed to the O. K. Jellico Coal Company. The business was continued under the management of Eldridge and others until in the fall of 1904, when, at his request, L. L. Parks was given the management. Additional money was then secured and put into the business, and he operated the mine for some months during the fall and winter of 1904 and 1905. The company did not prosper under his management and another superintendent was employed. He managed the mine for about two months, when he became convinced that it could not be operated at a profit, because the coal was of an inferior quality, and he so notified the company. In May following the company determined to quit business. All of its available resources had been exhausted and it was burdened by a considerable debt. The personalty at the mine was sold, and three of its directors paid all of the debts owing by the company, including $29.21 to Parks and wife as a balance of royalty and house rent due them. When the personal effects of the company were sold at the mine, an attempt was made to dispose of the lease by transferring it to another company, known as the Lily Jellico Coal Company.

In July following Parks and his wife caused a notice to be served upon the company declaring the lease for-

feited, and on August 26th, 1905, Parks and his wife filed suit against the company, in which they sought a cancellation of the lease, and to recover certain damages set up therein for violation of several provisions of the lease, and particularly because the mine had not been properly worked. The company demurred to the petition and each paragraph thereof, and, without waiving its right under the demurrer, filed its answer, in which it traversed the particular allegations of the petition setting up the breaches or violations of the lease for which a recovery was sought, and denied any indebtedness whatever to plaintiffs. Several amended pleadings were filed by plaintiffs, setting up additional claims for damage; and these were traversed. The plaintiffs dismissed so much of their original petition as sought to recover the leased property, as it appeared that they had previously taken possession of it. After quite a delay the case was finally submitted for trial upon the pleadings, exhibits and proof, and the special judge who presided found in favor of plaintiffs in the sum of $4,500, and entered judgment accordingly. The defendant appeals.

The correctness of the rulings of the chancellor is assailed upon many grounds, chief of which are that no cause of action was stated in the pleadings, and that the chancellor's findings are not supported by any or sufficient evidence. Appellee's chief complaint, as gathered from the pleadings and proof, is that appellant did not properly and diligently work the mine, it being claimed that if this had been done a large quantity of coal would have been taken therefrom and sold, and that appellees would have realized royalties thereon amounting to several thousand dollars. From the organization of the company until it practically abandoned the mine in May, 1905, there was more than $45,000 spent in an effort to make the venture a success. It seems that the company did all that it could to make the mine profitable. Its officers not only exhausted their own ingenuity, and that of the several managers employed by them, but of appellee, L. L. Parks, as well. He realized that the company was not meeting with the success he figured it should, and so he requested that he be given charge. This was done, but the only appreciable result of his labors was an increase in the company's liabilities. Apparently the efforts of the company and its managers, including Parks, were well directed, but the coal was of

a poor quality and could not be brought into competition with other coal on the market. It could not be sold at a price that made its mining profitable. The evidence abundantly establishes this fact, and, under the terms of the lease, appellant was only required to operate the mine so long as it could dispose of the coal at the market prices prevailing from time to time. When, therefore, it became apparent that the coal could not be disposed of, even at less than the market price which good coal was bringing at that time, appellant was not bound by the terms of his lease to longer operate the mine, and no cause of complaint is afforded appellees because they ceased operating it under such circumstances. Appellant could not be compelled, under the terms of the contract, to operate this mine when the coal which was being produced was of such an inferior quality as that it could only be sold with difficulty, and then at a reduced price. No ground of complaint being afforded because appellant ceased to operate the mine, it is unnecessary to notice further at length the claim for damages which appellees alleged they sustained because they failed to realize the royalties from the sale of coal which they might have realized had the mine proven a success and been operated as it was contemplated it would be when the lease was entered into. See Givens' Extr. v. Providens Coal Co., 22 Rep., 1217.

The further claim by appellees, that at the time appellant was running the mine there was a balance due them on royalties for coal that had been mined at that time, is not supported by the evidence. On the contrary, the decided weight of the evidence shows that when appellant ceased to operate the mine, it settled with appellees in full, both for royalties and house rent. The testimony of appellee Parks upon this point is very vague and unsatisfactory, and not supported by that of any other witness. Whereas, the testimony of the bookkeeper is direct and positive, and it is accompanied by a receipt, signed by Parks in his own right and as agent for his wife, and this receipt shows that it is in full for mine and house rent to May 18, 1905. The mine was not operated after that date. Appellant had made settlements for royalty and rent in this manner from time to time while the mine was being operated, and no proof is offered by appellees tending to show that the receipt was not for what it purports to be, or that any mistake was made at that time in the estimates of the amounts

due them. Under such circumstances the statement in the receipt, that it was a settlement of royalties and rents to that date, controls, and the chancellor was not justified in allowing anything upon this claim.

The other claims attempted to be asserted are for damages to the crops of appellees growing on their five hundred acre farm, of which the leased premises were a part; for injury to their roads on this farm and the approaches to certain entries of the mine; and for damage to growing timber, and for cutting timber above the size authorized by the lease. The facts upon which these claims for damage are asserted are not well or definitely pleaded, and the evidence offered in support to these claims is not at all satisfactory. All of these acts of damage to the approaches to the mine, the timber and the crops, if committed at all, must have been done at a time before the period that Parks had charge of the mine, and as he never made any complaint at any time to the company that they were being injured, we conclude that these injuries were more imaginary than real—in fact, they appear to be the result of an afterthought; and had appellant not ceased to spend money in an effort to make the mine a success, no such claims would ever have been asserted.

The complaint that the mine was so worked, by pulling stumps, etc., as to damage appellees and render portions of the mine unsuitable or unsafe for further use as a mine, is not supported by the evidence. On the contrary, the weight of the evidence shows that the mine was properly worked, and no stumps pulled from the main entries or passageways. Such stumps as were pulled were pulled from rooms of the mine that had been worked out. The mine was at all times worked under the management of competent men, some of whom —Eldridge in particular—were tacitly recommended by appellee Parks, and the failure of the company to make it a success was, as stated, due to the fact that the coal was not of a good, merchantable quality. There were faults in the coal veins that added materially to the cost of working, and aided in making the successful operation of the mine practically an impossibility.

The chancellor failed to state the ground upon which he rested his judgment. But he evidently proceeded upon the idea that, because the company failed to continue to operate the mine after it had been demonstrated that it could not be made a success, appellees had been

damaged to the extent of his finding by their loss of royalties. He lost sight of the fact that the company was not bound to operate the mine if the output could not be sold from time to time as other coal, and that when it was thoroughly demonstrated that this could not be done, the company was absolved from further liability to work it. Aside from this, when appellees took possession of the mine themselves, their right to demand pay from the company for failure to operate it ceased.

Without elaboration, we are satisfied, after a consideration of the lease, pleadings and proof, that appellees were not entitled to recover anything, and their petition should have been dismissed. Judgment reversed and cause remanded for further proceedings consistent herewith.