# Laurence E. Tierney Land Company v. Kingston-Pocahontas Coal Company.

(Decided May 8, 1931.)

STRATTON & STEPHENSON, GEORGE B. MARTIN, and JOHN H. HOLT for appellant.

J. J. MOORE, EDWARD C. O'REAR, and FRANCIS H, McADOO, and OVERTON HARRIS for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Reversing on original appeal and affirming on cross-appeal.

In the year 1916 the appellant and appellee were known as the Tierney Coal Company and the Solvay Collieries Company, respectively. Both of them have since changed their corporate names to those they now bear. On November 1, 1916, after an extended investigation of the property for it by A. B. Rawn, its then general manager, and C. A. Warden, an expert in mining properties, the appellee leased from the appellant part of the latter's large holdings of coal lands in Pike county. The property leased was known as lease No. 5 and contained 2,358.80 acres. Shortly after the execution of the lease, the appellee began the installation of

its mining plant, which was known as the Tolland mine, and by the middle of 1917 it was shipping coal. It was in this year that appellee initiated negotiations looking to the leasing of the additional territory from the appellant, but nothing came of them. On December 4, 1922, a supplemental contract was entered into by the appellant and appellee by the terms of which an area of 395 acres covered by the original lease was surrendered and the minimum royalty provided for in the original lease was reduced. The Tolland mine continued to be operated until October, 1923, when it was shut down. The appellee reported to the appellant that the mine was idle "on account of market conditions." The mine has not been operated since, but the minimum royalty was paid to and including the year 1925.

In 1924, appellee through A. B. Rawn, undertook to obtain some concessions in the provision for minimum royalties, but was unsuccessful. On December 16, 1926, appellee wrote to the appellant stating that it was satisfied that there was no mineable coal in the property, and there had been none since before 1923, by reason of which fact, the lease, as amended, had "ipso facto terminated." Appellee gave notice to appellant that it would vacate the property in thirty days, and called upon appellant to appoint its appraisers of the personal property located on the lease, so that, if it elected to take it over, as the lease provided might be done on its termination, the value could be fixed for that purpose. Appellant denied the contention of the appellee as to the exhaustion of the mineable coal, and thereupon appellee brought this suit against appellant to cancel the lease and recover the royalties paid for the years 1924 and 1925 on the theory that the mineable coal on the lease had been exhausted prior to October, 1923. On final hearing, the chancellor canceled the lease, but denied a recovery of the royalties paid for the years 1924 and 1925. Appellant appeals from the judgment of cancellation, and the appellee prosecutes a cross-appeal from so much of the judgment as denies it a recovery of the royalties paid for the years 1924 and 1925.

So far as pertinent, the lease here involved reads:

"This Deed of Lease, Made this the 1st day of November, 1916, by and between the Tierney Coal Company, a corporation, created and organized under the laws of the State of West Virginia, here-

inafter called the lessor, party of the first part, and Solvay Collieries Company, a corporation and hereinafter called the lessee, party of the second part,

"Witnesseth:

"First: That for and in consideration of the rents, royalties, terms, conditions and covenants as hereinafter set out, to be paid, kept and performed by the said lessee, the said lessor does hereby demise, let and lease unto said lessee, for coal mining and coke manufacturing purposes, but subject to the exceptions, reservations and conditions hereinafter contained, and for the period of thirty (30) years, with the privilege of renewal of this lease for a like period of years after the expiration thereof, all coal in the Freeburn seam as now known on Pond Creek within and included in the following described boundary. . . ." (Description Omitted.)

"Second: The said lessee shall have the sole and exclusive privilege of mining said coal on the above described premises embraced therein during the continuance of this lease. . . . This lease is not intended to cover or obligate the lessee to mine any seam of coal except said Freeburn seam. In the event any other seam of coal is discovered on or under the premises, and lessee determines to lease or operate same, it shall give said lessor notice of such intention, and lessee shall have six months thereafter within which to negotiate with lessor for a lease upon such seam or seams. . . .

"Third: In consideration of this lease the said lessee hereby covenants and agrees to pay to the lessor, its successors or assigns, during the continuance of this lease, as rental for said premises, a royalty of ten (10) cents for each and every gross ton of coal produced. . . .

"Fourth: From the date of this lease minimum royalties shall be paid as follows—that is to say:

"From November 1st, 1916, to January 1st, 1918, royalty shall be paid as above set forth for the coal actually mined; and from January 1st, 1918, to January 1st, 1919, there shall be paid $7,500.00; and from January 1st, 1919, to January 1st, 1920, there shall be paid $11,200.00; and from January 1st, 1920, to January 1st, 1921, there shall be paid $16,800.00;

and from January 1st, 1921, to January 1st, 1922, and each year thereafter there shall be paid $22,-800.00. . . . But, if the said lessee shall not mine in any one year as much coal as, at the rate of royalty above specified, amounts to the minimum royalty of said year, it shall have the right during the next succeeding year to mine free from royalty a sufficient amount of coal at the respective rate of royalty to make up the difference without interest between the royalty at the rate aforesaid on the coal actually mined in such year and the minimum royalty so paid for such year, provided that no coal shall be mined free in any year on account of any deficiency in the preceding year until the amount of coal required to pay the minimum royalty for the year in which such coal is mined free shall have been mined, and no payment in excess of the minimum in any one year shall be credited against the deficiency in any subsequent year.

"If adverse mining conditions develop which render it impracticable to mine the quantity sufficient to make up the royalties, without materially adding to the actual normal cost of mining and removing the coal, then the lessee may ask that the minimum royalties be reduced to meet such mining conditions, and thereupon the question of (a) whether such reduction is justified or not and (b) to what extent and to what time the reductions shall be made, shall be submitted to arbitration as provided for in this lease. . . .

"Seventh: The lessee . . . . covenants and agrees that it will work and mine the Freeburn seams of merchantable coal that can be mined at a reasonable profit, and will carry on its mining operations in a careful, skillful and workmanlike manner, according to the most approved and improved and suitable methods of modern mining, complying in every respect with the laws of the State of Kentucky, and the United States, and such mining shall be done in such way and manner and method as to mine all the merchantable coal practicable, and to use due regard to the future value of the demised premises. The lessee shall begin and pursue its mining operations on said seams at such times and in such ways that all the recoverable coal may be secured and no part of the seam shall be lost.

"Eighth: The lessee further covenants that it will drive the regular size gangways and airways through such operations of any vein or bed of coal to be operated by it, as may prove faulty, or may not yield marketable coal, and it will leave no more valuable coal in its said mining operations than may be necessary for full security, . . . provided, however, that should the lessee deem it impracticable or disadvantageous to mine through such faulty or unmerchantable coal, the lessee may give thirty (30) days notice in writing to the lessor that it intends to abandon that part of said mine so found impracticable or disadvantageous to operate, and if the engineer, or any other proper officer of the lessor agrees thereto, then, in that event, the lessee may abandon the same, but if the said engineer, or other proper officer of the lessor shall deem it practicable and advantageous that said faulty or unmerchantable coal should be mined, as hereinbefore required, then the lessee shall have the right to submit such question to arbitration, as hereinafter provided. . . .

"Ninth: . . . It is understood and agreed, however, that all the coal covered by this lease shall be mined and paid for where it is practicable to mine and remove the same according to the most modern methods of mining. . . .

"Fifteenth: The rent and royalties hereinbefore mentioned shall be treated and considered as rent reserved for the demised premises. . . .

"Sixteenth: At the termination of this lease, otherwise than by forfeiture, all the improvements placed upon the surface of the demised premises, shall be valued . . . and the lessor shall have the privilege of purchasing said improvements at such valuation. . . .

"Seventeenth: In case the lessee shall abandon said lease, or, when not prevented by a strike, riots, damage to or destruction of the improvements, or failure to obtain transportation of coal mined, shall fail to work and operate the same in good faith, for a period of four (4) months, at any one time, then this lease and all rights thereunder of the lessee shall be forfeited. . . .

"Twenty-Second: It is further agreed between the parties that in the event of the failure or refusal

of the lessee to do or perform the covenants and undertakings herein agreed to be done and performed by it, or any of them, shall, at the election of the lessor, work and operate as a forfeiture of this lease and all the rights leased and secured thereunder.''

The chancellor was of the opinion that, fairly construed, this lease obligated the appellee to conduct its mining operations thereunder only so long as it could by conducting those operations in a careful, skillful, and workmanlike manner, according to the most approved, improved, and suitable methods of modern mining, sell the coal at a reasonable profit under normal conditions of the market, and that, if it could operate under the conditions named only at a loss, it was entitled to be relieved from its contract and the payment of minimum royalties. To sustain this construction of the lease and applicable law upon such construction, he cited certain cases we shall presently discuss. Having so construed the lease, the chancellor then examined into the facts, and concluded that the appellee could not operate the Tolland mine under the conditions above set out at a profit under normal conditions of the market, and never would be able to do so; for which reason he canceled the lease. We have carefully read the 2,656 pages of proof taken in this case, and have concluded that, if the chancellor correctly construed the lease, and correctly interpreted the applicable law, it cannot be said that he erred in canceling the lease. Therefore we are brought at once to a consideration of the construction of the lease. Appellee insists that, by its terms, the lease obligated the lessee to mine only such coal as was merchantable and as could be mined at a reasonable profit. It bases that contention on the provisions of clause 7 of the lease, buttressed by the interpretation it says should be put on phrases and provisions appearing in other clauses of the lease. Appellant argues that the subject-matter of the lease was the ''Freeburn seam,'' as clause 1 of the lease so stated; that there was no express covenant by the lessor as to the thickness or quality of that seam, and that the most onerous implied warranty that could be invoked against the lessor is that the seam would persist in normal thickness and quality, and would turn out to be such a mining proposition as the parties contemplated at the time of the making of their contract; that the lessee covenanted to pay as dead rent for the privi-

lege of mining this Freeburn seam the minimum royalties provided for by clause 4 of the lease and in addition thereto, in order that the lessor might get the full benefit of its lease in the way of royalties over and above the minimum, did by the seventh clause of the lease agree to produce all the coal that could be produced at a reasonable profit.

Appellant is correct in its position that the evidence very satisfactorily establishes that the subject-matter of this lease has not disappeared. It was the "Freeburn seam of coal," and exists today in the Tolland mine in quantity and quality as known and to be expected at the date of the lease. It is true that the seam at the outcrop was somewhat thicker than it is further into the hill, but the seams in the surrounding mines, the test holes that were bored prior to the making of this lease, and the knowledge that seams are thicker as a rule near the outcrop than in the hill, all carried home to the appellee the knowledge that it was to expect the thickness of seam in the mine itself that it has now encountered. It is not because the seam as it was in quantity and quality to be expected at the date of the lease has dwindled and/or disappeared that appellee is unable to mine and market this coal at a profit, but it is because the sale price of coal has fallen so far below the prices prevailing in 1916 when this lease was made that the cost of producing, cleaning, and marketing this coal cannot be met with sales realization. Due to the presence of laminated and cap coal, and indeed some splint coal, this seam cannot be mined and marketed for the purposes for which it is best adapted, that is, for by-product purposes, without its being very carefully cleaned; for otherwise the ash content of the coal is too high to meet the specifications of the by-product market. But the cost of cleaning the coal, when added to the present high production costs of the coal itself, runs the total cost of the coal beyond that which can be realized from its sale.

As stated, though, the inability to mine at a profit under normal circumstances is not due to anything that has happened to the quantity or quality of the seam as known and to be expected at the date of the lease but to falling market prices that have occurred since that date. No doubt it is because of this fact that appellee so strongly insists that the lease is to be construed according to the outline of its position hereinbefore set out. At

the outset, appellee argues, and the chancellor so held, that, at least in the absence of any provision in the lease to the contrary, the law reads into all of these mining leases an implied condition that they are to be terminated when the lessee conducting his mining operations in a prudent manner according to the most improved and approved methods of mining can no longer mine and sell his coal at a reasonable profit in a normal market. To fully support appellee's position, such an implied condition would have to be broad enough to include, not only the failure to mine and sell at a reasonable profit due to the dwindling and exhaustion of the seam, but also the failure to mine and sell at a reasonable profit due to a falling market.

The cases upon which the chancellor relied are not so broad. In their chronological order, we find that in the case of O. K. Jellico Coal Co. v. Parks, 146 Ky. 674, 143 S. W. 22, 24, we upheld the right of the lessee to cease mining operations, because, due to the inferior quality of the coal, it could no longer be mined and sold at a profit in competition with other coal, or even at a price less than the usual market price. But the judgment was not rested on any implied condition of the lease, but because of the fact ''that the company was not bound to operate the mine if the output could not be sold, from time to time, as other coal,'' and this because, ''under the terms of the lease,'' the company ''was only required to operate the mine so long as it could dispose of the coal at the market prices prevailing from time to time.'' As this case was rested on the express terms of the lease, it does not involve any question as to ''implied conditions.''

The next case is that of Auxier Coal Co. et al. v. Big Sandy & Millers Creek Coal Co., 194 Ky. 14, 238 S. W. 189, 191. In that case, a mining lease was held terminated when the mineable coal in the mine had been exhausted. The court said that ''substantial evidence supports the view that the coal theretofore mined was really taken from a pocket which in the earlier operations had been exhausted.'' This case does support the position that there is an implied condition in these mining leases that they shall terminate when the coal has been so exhausted or dwindled from the state it was in at the time the lease was made that it can no longer be operated at a profit. It does not go to the extent of holding that, although the seam remains in existence in the quality and quantity as known and to be expected at the

date of the lease, the lease can be terminated because of unprofitable operation due to falling markets.

The next case is that of Muncey Coal Mining Co. v. Muncey, 206 Ky. 638, 268 S. W. 293. There the lease itself provided for a seam of minimum thickness of thirty-six inches, and the only question involved was whether the seam discovered came up to the requirement of such minimum. In construing the lease, we held that it provided by its terms for a pro tanto suspension of the payment of royalties so long as the seam fell below thirty-six inches and the lessee was diligently endeavoring to discover a seam of such minimum requirements. In that very case a contention of the lessee that it was costly to clean the coal of impurities caused by a parting did not relieve the seam of its character as a thirty-six inch seam and hence a payment of royalties on the part of the lessee. This case does not uphold the contention of the appellee or the holding of the chancellor at least to the extent of a right to terminate a lease due to falling markets. On the contrary, it rather impliedly upholds the view that, if the seam as contracted for be present, then the lessee must pay the royalty no matter what his cost of production may be. All this, of course, is on the assumption that there is nothing in the lease expressly to the contrary. In Barney v. Sword, 226 Ky. 728, 11 S. W. (2d) 920, we have presented a case of the exhaustion and/or dwindling of the seam of coal, the subject-matter of the lease and the rule of Auxier Coal Co. case, supra, was applied.

To these cases cited by the chancellor the appellee has added the cases of Byrd et al. v. Anderson et al. 207 Ky. 317, 269 S. W. 323, and Hendon et al. v. De Bardeleben Coal Corp. (C. C. A.) 30 F. (2d) 686. The former case involved a gas lease and a gas well which had become exhausted. The rule of the Auxier Coal Co. case, supra, was applied. In the Hendon case, the court said that the lessees agreed to pay the lessors a royalty of eight cents a ton "for all merchantable coal actually mined, and for a minimum of 2,500 tons per month, after the first year, whether mined or not." The seam became so exhausted as that it could not be mined at a profit, and the court held that the obligation to pay royalties ceased. This case presents the situation of the Auxier Coal Company case, supra, and further, the covenant as to payment of royalties confined such payment to merchantable coal. We therefore see from a review of the author-

ities cited and relied upon by the chancellor and the appellee that they go no further than to relieve a lessee from the payment of royalties when the profitable operation of the mine ceases because of the dwindling or exhaustion of the coal itself. In none of them was there present the question whether the lessee has a right by virtue of an implied condition in the lease to terminate the lease because of falling markets, although the seam in the quantity and quality as known and to be expected at the date of the lease persists. The Kentucky cases and the rule developed by them are but the application of the well-settled rule of contracts to the effect that, when the performance of a contract is based upon the continued existence of a given thing the existence being assumed as a basis of the contract, performance is excused when the existence fails. Beach on Contracts, sec. 217. Cf. Williston on Contracts, sec. 1567. But we apprehend that it cannot be successfully contended that, where a party binds himself absolutely to perform a given undertaking, he should be excused, not because of the nonexistence of a thing whose continued existence was impliedly assumed as the basis of the contract, but because it has become financially onerous upon the obligor to perform. Thus in Anspach v. Bast, 52 Pa. 356, the obligor bought a colliery, for the purchase price of which he gave a note to be paid at the rate of a stated amount per ton of coal mined by him; he agreeing to diligently mine the coal. It was held no defense to a suit on the note that the obligor had, because of stagnation in business, been unable profitably to mine the coal. If the obligor has bound himself absolutely to perform, he cannot excuse himself because performance will cause him financial loss. The parties do not in such state of case impliedly contract for a discharge of the contract if its performance will work a financial loss upon the obligor. This is the risk he takes. We are therefore clearly of the opinion that in the lease contract here under discussion there was, so long as the seam of coal exists in quantity and quality as known and to be expected at the date of the lease, no condition implied in law which would relieve the lessee from the payment of royalties because the mining of that seam could no longer be conducted at a profit due to falling prices, even though those prices would in all probability never again rise to where they were when the lease was executed.

This then brings us to the question whether the lease by its express terms obligates the payment of the minimum royalty during the term of the lease, or at least so long as the seam of coal exists in quantity and quality as known and to be expected at the date of the lease, or obligates the payment of that royalty only so long as the seam can by prudent and skillful management, according to most approved and improved methods of mining, be mined at a reasonable profit in normal times. The first clause of the lease lets to the lessee for the period designated "all coal in the Freeburn seam as now known on Pond Creek," but "subject to the exceptions, reservations and conditions" thereafter contained in the lease. By the second clause, the lessee is to have the sole right "of mining said coal," but the lessee is not to be obligated "to mine any seam of coal except said Freeburn seam." In consideration of the lease, the lessee is by the fourth clause of the lease required to pay a royalty of ten cents per ton for every ton of coal produced (and certain royalty for coke, etc.), and by the fifth clause it is required to pay certain minimum royalties (reduced in amount by the supplemental agreement). The only excuse this clause provides for the nonpayment of this minimum royalty in whole or in part is the encountering of adverse mining conditions which render the cost of mining abnormal, and then the minimum royalty may be reduced to cover the added costs above normal costs of mining. By the ninth clause of the lease, it is provided that the lessee shall mine all coal covered by the lease where it is practicable to mine and remove the same according to the most modern methods of mining. The fifteenth clause provides that the rents and royalties shall be treated and considered as rent reserved for the demised premises.

Up to this point, there is no difficulty in construing the lease as an absolute obligation to pay the minimum royalty so long as the Freeburn seam exists in quantity and quality as known at the date of the lease. The terms of the lease so far quoted demise that seam, and the obligation to pay the minimum royalty is stated to be "rent reserved for the demised premises." However, in finally arriving at the proper construction to put upon this lease, we must add to the clauses heretofore considered the seventh and the eighth. It will be remembered that by the seventh clause the lessee covenanted that it would "work and mine the Freeburn seams of merchantable

coal that" could "be mined at a reasonable profit," the mining to be done in such fashion "as to mine all the merchantable coal practicable." By the eighth clause the lessee covenants to drive regular gangways and airways through such veins of coal operated by it as may prove faulty or may not yield marketable coal, but may under certain conditions be relieved of its obligation, although under certain other conditions it can be insisted upon. Appellee argues that the full measure of its obligation to mine coal is contained in this seventh clause of the lease; that the demise in the first clause of the Freeburn seam is by that clause itself, subject "to the exceptions, reservations and conditions" thereafter contained in the lease, and the seventh clause is such an "exception, reservation and/or condition"; that in the other clauses of the lease in which reference to the seam to be mined is made the expression used is "said coal," which means the coal mentioned in the first clause, and that clause, as stated, demises the seam of Freeburn coal subject to the exception, reservation, and/or condition appearing in the seventh clause, and that clause only obligates the appellee to mine coal as can be mined by prudent and skillful methods at a reasonable profit.

But the provisions of the seventh clause of the lease are not an exception, reservation, or condition. They comprise a covenant that is for the benefit of the lessor. It puts upon the lessee the obligation to mine all the coal it can at a reasonable profit by prudent and skillful methods of mining to the end that the lessor will not only get its minimum royalty, but also such royalties in excess of the minimum as the compliance by the lessee with this clause of the lease will produce. Such a construction harmonizes all the clauses of the lease. The other clauses so clearly require the payment of the minimum royalty, at least so long as the Freeburn seam exists in quantity and quality as known at the date of the lease, that it would require very unambiguous provisions to overcome the clear intent of the parties which they evidence. The seventh clause is no such unambiguous provision. Indeed, when read in the spirit and intent of the other provisions, it is obvious that it was inserted to prevent the lessee from letting the property remain idle or mining no more than would produce the minimum royalty when it could by prudent and skillful mining produce at a reasonable profit more coal than the minimum royalty would take care of. We are

therefore of the opinion that the seventh clause of the lease does not modify the other clauses as appellee contends, and that under the lease as we have construed it and the facts which the evidence established the appellee was and is under the obligation to pay the minimum royalty so long as the Freeburn seam exists in quantity and quality as known at the date of the lease. We find no provision in the lease, though, for precipitating the royalty payments for the entire term of the lease, and appellant is entitled only to a judgment at this time for the minimum royalties unpaid at the time the judgment was entered below in this case. Our conclusions rendered it necessary to affirm appellee's cross-appeal, as it follows from what we have said that it is not entitled to recover the royalties paid for the years 1924 and 1925.

The judgment is therefore affirmed on the cross-appeal and reversed on the original appeal, with instructions to enter a judgment in conformity with this opinion.

Whole court sitting.