## MARTIN'S FORK COAL CO. v. HARLAN-WALLINS COAL CORPORATION.

District Court, E. D. Kentucky.

April 17, 1934.

Wm. Lewis, of London, Ky., and J. B. Snyder, of Harlan, Ky., for plaintiff.

N. R. Patterson, of Pineville, Ky., for defendant.

ANDREW J. COCHRAN, District Judge.

This suit is before me on file hearing and for final decree. The plaintiff made a lease of certain coal lands in Harlan county in this district to the Catron's Creek Coal Company September 20, 1913, and an additional one April 18, 1917. The land covered by both leases adjoin and constitute one body of land. November 1, 1918, these leases passed to the Wallins Creek Collieries Company through intermediate assignments—September 23, 1924, that company assigned them to the defendant Harlan-Wallins Coal Corporation. It was provided in the assignment as follows:

"The party of the second part assumes the aforesaid leases as of the 1st day of September, A. D. 1924 and expressly assumes and agrees to pay the rents or royalties therein reserved, which may become due from and after said date and to keep and perform all covenants, agreements and conditions to be done, performed and kept on the part of the lessees or the assignees of said lessees in said leases hereby transferred and assigned."

On January 24, 1931, whilst the defendant was operating the lease, this suit was brought in the Harlan circuit court whereby plaintiff sought judgment against the defendant for $230,000; that it be adjudged a lien to secure same upon all the structures, equipment, machinery, T-iron, and personal property of whatever nature of the defendant upon the premises; and that it be enjoined from removing any of the property from the premises and from prosecuting the mining operation in such unworkmanlike and unjudicious manner as to wrap up and cut off any further coal in the mines or entrance thereto. At the same time a temporary restraining order was granted by the clerk of that court. Thereby the defendant was enjoined and restrained from "removing from the leased premises any structures, houses, equipment or machinery or T-iron or rails or cars or any personal property of whatever nature—from tearing down, destroying or demolishing or permitting to be torn down, destroyed or demolished any buildings, houses, structures, tipples of whatever kind or character upon the leased premises—and from removing the support from the mouths of the entries which it was then operating in such a way as to permit the entries to fall in and close up and prevent ingress or egress into the entries until further orders of the court." The summons and restraining order were executed on defendant January 26, 1931, and on January 27, 1931, the defendant ceased further operations under the leases.

Thereafter the suit was removed to this court. It is before me solely on the question as to plaintiff's right to a money decree.

■ The principal item for which recovery is sought is on account of waste committed in the operation of the lease in an unworkmanlike manner. Reliance is had on both common law and section 2328, Kentucky Statutes. As upholding· the right of recovery, the decisions in the cases of Mullins v. Dees (Ky.) 124 S.W. 828, and Wells-Elkhorn Coal Co. v. Moore, Guardian, 217 Ky. 292, 289 S.W. 247, are relied on. It is claimed that plaintiff is entitled to recovery from defendant for such waste committed since the entry under the lease, i. e., by the original lessee and the assignees prior to defendant. The plaintiff's position is thus stated in its brief:

"The plaintiff insists that the last assignee, the defendant Harlan-Wallins Coal Corporation, is liable to the plaintiff for all of the acts of its previous assignors. In other words, the defendant was liable to the plaintiff for waste and loss of coal caused by the careless mining or improper, imprudent, negligent or wrongful mining or methods of all previous lessees. This liability of the last assignee for the acts of‿previous lessees is twofold. Such liability exists because it has been‿expressly assumed in and by the contracts of assignment. That liability also exists because the last assignee by both express and implied covenant bound itself to carry out the terms and provisions of the lease. Both of these forms of liability inure to and are for the benefit of the lessor and the lessor is entitled to enforce such liability in this action."

The first thing to be determined in this connection is whether this position is sound. I do not think that it is sound. It is to be noted that there is both privity of estate and of contract between plaintiff and defendant. The privity of estate grows out of the fact that the defendant is an assignee of the lease. That of contract grows out of the terms of the assignment heretofore quoted. It is certain that defendant is not liable for waste committed by the previous holders and operators of the lease by reason of such privity of estate. In the case of Washington Natural Gas Co. v. Johnson, 123 Pa. 576, 16 A. 799, 801, 10 Am.St.Rep.

553, concerning the liability of an assignee of an oil and gas lease, this was said, "Each successive assignee would be liable for covenants maturing while the title was held by him because of privity of estate, but he would not be liable for those previously broken, or subsequently maturing, because of the absence of any contract relation with the lessor."

In the case of Consolidated Coal Co. v. Peers, 166 Ill. 361, 46 N.E. 1105, 1107, 38 L.R.A. 624, it was said, "The rule is that, as the liability of the assignee grows out of privity of estate, and that only, it ceases when that privity ceases to exist; and each successive assignee is liable for only such breaches of covenant as occur while there is privity of estate between him and the lessor."

If then the defendant is liable for such waste, it must be because of the privity of contract between it and plaintiff. In 35 C.J. p. 996, it is said, "However, where the assignee expressly assumes the covenants of the lessee, a liability arises which is based upon privity of contract, and, subject to the rules permitting a person for whose benefit a contract is made to sue thereon, the landlord may maintain an action by reason thereof."

But on page 997 it is said further, "The assignee is not liable for breaches occurring prior to the assignment, in the absence of an agreement to the contrary."

The question here, then, comes to this. Did the defendant in the contract of assignment agree to become liable to plaintiff for breaches of any of the covenants of the lease prior to the assignment? It is clear that it did not. There are three items in that contract. There is first a general assumption of the leases, but it is expressly provided that the assumption is "as of the 1st day of September, A. D. 1924." It does not go back of that date. Then there is an assumption and an agreement to pay "the rents or royalties therein reserved," but they‿are the rents and royalties "which may become due from and after said date," i. e., September 1, 1924. There is no assumption or agreements to pay rents and royalties which become due prior to that date, and which had not been paid. Finally there is an assumption and an agreement "to keep and perform all covenants and agreements and conditions to be done, performed or kept on the part of the les-

sees or the assignees of said lessees in said leases hereby transferred and assigned." There is here no agreement to answer for previous breaches of any of the covenants and agreements and conditions in the leases. It is merely on defendant's part to keep and perform them. This can only apply to covenants and agreements and conditions not theretofore breached and still open to be kept and performed. The two previous items make certain that this one does not look to the past. They look only to the future. None of the decisions relied on by the plaintiff support its position. On the contrary, the decision in the case of Wells-Elkhorn Coal Co. v. Moore, Guardian, 217 Ky. 292, 289 S.W. 247, 248, is against that contention. It does not recognize as stated by plaintiff that "the assignee of a lease is liable for breaches of the covenants of the lease occurring prior to the assignment when the assignee has contracted that the covenants of the lease shall be performed." It said: "In 35 C.J. 997, it is written: 'The assignee (of a lease) is not liable for breaches (of the covenants of the lease) occurring prior to the assignment in the absence of an agreement to the contrary.' No agreement to the contrary, express or implied, having been shown, the appellant cannot be held responsible for what the Black Diamond Mining Company did, or for the coal lost by an improper method of mining adopted by the latter in this area. The appellees fixed the amount of coal lost in this area as high as 5,000 tons, although it would seem that the great preponderance of the evidence does not establish a greater loss than 4,000 tons. But whatever the loss is the appellant is clearly not responsible for it."

The unsoundness of this position of plaintiff is fatal to its right to recover on account of this item. The case has not been prepared on the basis that defendant's liability to plaintiff on account of waste is limited to waste committed by it. It is prepared solely on the basis that it is liable for all waste committed from the beginning of the operation of the lease—by those who operated it prior to the assignment as well as by defendant. Assuming that there is evidence tending to show that the defendant committed waste, it is impossible therefrom to determine what waste was committed by it, as distinct from that committed previous to the assignment to it. According to the testimony of plaintiff's expert witness, Frederick Bayless, as I make it, no waste was committed by defendant. He examined the mine in 1918, went in and around it on a friendly visit in 1922, and examined it on behalf of plaintiff first on January 7, 1931, and again on January 25, 1931, the day after the bringing of this suit and the day before the service of process and the temporary restraining order on defendant. He testified that the advance work in the rooms and things like that was not followed out with reasonable care and in a workmanlike manner. In the early development, probably back in the Catron creek days, or at least in the Wallins Corporation days, the rooms were driven without regard to safe or proper width. They were the result of a helter skelter width, with pillars of varying width. Sometimes the rooms came together and made a great big wide area. This is clearly shown through the mine workings on the official map. It is not in any one area. It is throughout the mine, showing that it must have taken place during the early development and during more or less any other period of development. This was not proper for a full recovery or a proper retreat. If you pull pillars back track on that heavy sand rock weight, you invite a squeeze and will get it. The retreat was affected very much by the advance. The retreat was affected by the careless way in which the rooms had been driven and the improper pillars left between the rooms. If the advance had been properly carried on, 38 to 42 per cent. of the coal should have been taken out and the final recovery should have been about 85 per cent. or better. The final recovery was only 66.68 per cent. That such was the case was because of the defective or faulty advance system. This affected the ability to recover all the coal on the retreat that ought to have been recovered. I do not understand him to have testified that there was any improper or unworkmanlike mining on the retreat. It was confined to the advance. But such mining on the advance affected seriously the amount of coal recoverable on the retreat. This improper and unworkmanlike mining he attributed to the defendant's predecessors. If he attributed any of it to defendant, it is impossible to tell from his testimony how much.

In the case of Eastman Kodak Co. v. Southern Photo Co., 273 U.S. 359, 47

S.Ct. 400, 405, 71 L.Ed. 684, it was said, "Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."

Assuming that he not only attributed some of the improper and unworkmanlike mining on the advance to defendant, but that he testified that there was improper and unworkmanlike mining on the retreat by it, he gave no testimony as to the extent of such mining on defendant's part or as to the extent to which the recovery was affected thereby. Seemingly he attributed all the improper and unworkmanlike mining on the advance to defendant's predecessors and it is not clear, at least, that he testified that there was any such mining by defendant on the retreat. Hence no reasonable basis is afforded by his testimony for computing the damage, if any, sustained by plaintiff due to waste committed by it. In the case of Shannon v. Shaffer Oil & Refining Co. (C.C.A.) 51 F.(2d) 878, 882, 78 A.L.R. 851, a claim for waste under a gas and oil lease was denied because though there was evidence of waste on the part of the lessee it afforded no reasonable basis for computing plaintiff's loss due thereto. It is said that there was "no substantial basis left from which a jury could make a rational estimate of the amount of avoidable waste."

The plaintiff introduced many witnesses in addition to Bayless. It is extremely difficult to understand the exact force thereof. This is due to the fact that little pains was taken to explain matters in relation to coal mining to one without familiarity therewith. It was taken for granted that I knew as much about it as the witnesses and counsel. The favorite word of plaintiff's counsel to describe what he conceived to be wrongful conduct on the part of defendant was "hogging." No witness even made use of it. This word conveys to me the idea of taking more than one's share. Seemingly plaintiff's complaint is that defendant did not take its full share. Possibly I was at fault in not seeing to it that matters were made plainer to me than they were. It may be taken, however, that the effect of this testimony is that waste was committed in the operation of the mine. But no attempt was made to separate waste that may have been committed by defendant from that committed by its predecessors. The thought of Bayless that the amount of recovery on the retreat had been seriously affected by the improper and unworkmanlike mining on the advance by defendant's predecessors does not appear from such testimony. It is doubtful, to say the least, whether it is negatived thereby. It is certain that under defendant's predecessors a squeeze and a creep developed on the left side, which prevented the recovery of coal that might otherwise have been recovered and that to a serious extent. No allowance is made in this testimony therefor. It must be conceded, however, that the impression, if not conviction, which this testimony makes is that defendant did commit waste. But it is absolutely impossible to form any conception therefrom as to how much, even approximately, was committed by it. That testimony affords no reasonable basis for arriving at an approximate estimate thereof. There was considerable testimony as to the use of dynamite by defendant. But apart from that of A. H. Gross, it cannot be said that the use of such dynamite was improper. There is no question but that it may be proper at times to use dynamite. If, however, any of this dynamite was improper, no estimate can be formed as to the extent of it. Gross was stationed by plaintiff at the mine from January 29, to April 1, 1931, as night watchman. He testified as to hearing shots in the mine and slate falling on the nights of February 4th and 9th. He did not know who was doing this shooting and there was no testimony connecting defendant therewith. By defendant's permission plaintiff's expert witness, Bayless, entered the mine on January 7, 1931, and again on January 25, 1931, with a practical miner named White and he was furnished the mine map. It was from this information that he was enabled to give his estimate of the waste that had been committed in the operation of the mine. In view of this, it is difficult to make out that defendant had any motive to cause the shooting testified to by Gross.

Limiting myself to plaintiff's evidence, I am driven to the conclusion that this item of plaintiff's claim is not sustained. This follows from these propositions. The defendant is liable only for waste committed by it. It is not liable for waste

committed by its predecessors. It is not liable for inability to recover coal caused by improper and unworkmanlike mining done by them. If it be taken that it did commit waste to any extent, no rational basis for estimating the extent of such waste has been afforded by plaintiff. It is to be noted that at no time during defendant's operation plaintiff made objection to its manner of operation.

■ The next item in plaintiff's claim which calls for consideration is the royalty of 10 cents per ton on the 19,500 tons of removable coal which the defendant was in the act of removing at the time the suit was brought and which it did not thereafter remove. The defense to this claim is that it was prevented from removing it by the temporary restraining order sued out by plaintiff. If it was so prevented, there can be no question that no recovery can be had on account thereof. The restraining order was from removing the support from the mouth of the entries which it was then operating in such a way as to permit the entries to fall in and close up and prevent ingress and egress into the entries until the further orders of the court. The only entries which the defendant was then operating as the plaintiff knew from the information obtained from Bayless were the main entry and the second left. The main entry certainly had a mouth. I see no reason for saying that second left did not have a mouth. The presupposition of the order is that it did. There may be a question as to how far back the mouth of each entry extended. The presupposition of the order would seem to be that it covered the then unremoved coal which was removable. It was only in case that it did could its removal cause those entries to fall in and close up and prevent ingress and egress thereto. It was hardly possible for such coal to be removed without bringing about such result. Such being the case, defendant could not remove it without running the risk of being in contempt of court. The plaintiff when it secured this order know exactly what defendant was then doing. If this coal could have been removed without producing such result, provision should have been made in the order for its being so removed. I am, therefore, constrained to hold that no recovery can be had on account of this item.

■ The next item for consideration is the claim growing out of the defendant's failure to operate the Kellioka and Mason seams, between which the Harlan seam which was operated lay. That claim as finally put is the minimum royalty for the time which it would take to mine out these two seams. This claim depends on whether this coal was "workable and merchantable." This provision in the lease was that defendant was to "remove all workable and merchantable coal." The coal which it was bound to remove was such as was merchantable as well as workable. I need, therefore, concern myself only with the question whether the coal in either of these two seams was merchantable. The defendant cites seventeen decisions without attempting to bring out the relevancy of either one of them. Its counsel is in the habit of bunching and flinging at the court numerous decisions on a certain point with the expectation that the court will go through them with a view of determining their relevance. As a rule, I have found that the most of them are not relevant. I am not going to take the pains of examining the seventeen decisions to determine their relevancy. The plaintiff cites Words and Phrases, First Series, vol. 5, p. 4489, where it is said, " 'Merchantable,' as used in mercantile contracts, denotes the salableness of the goods, and signifies ordinary quality or medium quality of goodness."

It also refers to 21 A.L.R. at page 367 where it is said, "It has been said that the word 'merchantable' is well adapted to convey the idea of mediocrity in quality, or something just above that. Warner v. Arctic Ice Co. (1883) 74 Me. 475. And that the word 'merchantable' as used in this connection, means, at least, medium quality or goodness. Empire Cream Separator Co. v. Quinn (1918) 184 App.Div. 302, 171 N.Y.S. 413."

According to these authorities, in order that an article of commerce may be said to be merchantable, it must be salable, and in order to be this, it must possess an ordinary or medium quality of goodness. These statements have reference to articles of commerce which are salable in good condition. They do not have special reference to an article of commerce which, as in the case of coal, has to be mined in order to be placed on the market. As used in this connection, it cer-

tainly includes the idea of workability. It cannot be merchantable if it is not workable. It would seem also to include the idea of being mined and sold at a profit. Of course, this does not mean in a time of acute depression, but under ordinary conditions. The decision in the case of Auxier Coal Co. v. Big Sandy & Millers Creek Coal Co., 194 Ky. 14, 238 S.W. 189, 191, cited by defendant is an authority for this position. There the lease granted to the lessee the right to mine "all seams of coal in and under the leased premises," and provided that the lease was made for the sole and "only purpose of mining and shipping coal and manufacturing and conducting a general merchandize business in connection therewith." There were no words of limitation as to the seams of coal the right to mine which was granted from which grant the duty to mine on the lessee's part flowed. It was held that he was only bound to mine "minable coal," and that by this was "meant coal that could be profitably mined by judicious methods." The decisions cited by plaintiff are not against the position that merchantable coal means coal that can be so mined. In the case of Muncey Coal Mining Co. v. Muncey, 206 Ky. 638, 268 S.W. 293, the coal on which a minimum royalty was to be paid was "workable coal, 36 inches to be the minimum." The controversy was as to whether a certain seam of coal came within this description. The lessee claimed that it did not in that it could not be "mined at a profit." It required cleaning and this caused "great expense" and rendered it impossible for it to market this coal in competition with other coal in the vicinity. The court said that it was "in considerable doubt as to whether or not this seam of coal found is such a seam as satisfies the requirements of appellant's lease." That which gave rise to the doubt was evidence that all of this seam of coal in that field required cleaning "that all coal companies have to and do clean the coal; and that it is universally considered in this field that coal similar to that found by appellant satisfies the requirement of a 36-inch minimum seam as provided for by appellant's lease." The case was disposed of on the assumption that the seam of coal in question could be "mined at a profit" and such evidence was sufficient to justify the court in holding that it could. This case is against plaintiff.

The only other decision which plaintiff cites and which can be claimed to be pertinent is that in case of Tierney Land Co. v. Kingston-Pocahontas Coal Co., 241 Ky. 101, 43 S.W.(2d) 517, 522. This case, however, does not support plaintiff's position. The contract of the lessee there was to mine and pay royalty on a certain specific seam of coal, to wit, the Freeburn seam. It was held that the lessee was obliged to comply with its contract "so long as the Freeburn seam exists in quantity and quality as known at the date of the lease," and that it was not relieved from its obligation because by reason of falling prices the coal in that seam could not be mined and sold at a profit. The implication of the discussion is that if the contract had been to mine and pay royalty on all merchantable coal in the premises, the result would have been different. The decision in Auxier Coal Company Case was considered and approved. It had this to say as to the decision in the case of Hendon v. De Bardeleben Coal Corp. (C.C.A.) 30 F.(2d) 686: "The court said that the lessees agreed to pay the lessors a royalty of eight cents a ton 'for all merchantable coal actually mined, and for a minimum of 2,500 tons per month, after the first year, whether mined or not.' The seam became so exhausted that it could not be mined at a profit, and the court held that the obligation to pay royalties ceased. This case presents the situation of the Auxier Coal Company Case, supra, and, further, the covenant as to payment of royalties confined such payment to merchantable coal."

I am unable to make out from the report of the Hendon Case that it was such as thus stated. According thereto, the contract was to mine until "all coal under such lands shall have been mined." It was held that this meant "when it could be mined at a profit." Though the facts of the Hendon Case were not such as stated in the Tierney Case, the opinion therein gives the court's view of the case which it states. And the decision in the Hendon Case as it actually was is directly in point.

It must be held therefore that the undertaking of the lessee to mine and pay royalty on all "workable and merchantable coal" on the leased premises was limited to coal that could be mined and sold at a profit under ordinary or average conditions. The evidence justifies the con-

clusion that neither the Kellioka nor the Mason seams of coal in the leased premises could be so mined and sold. Indeed it goes so far as to make out that such coal was not salable. H. M. Yeager, a capable mining engineer, made a thorough examination of these two seams as they exist on the leased premises. As to the Mason seam, he testified, "The thickness of this seam as exposed by these openings renders it absolutely unminable, except at a prohibitive cost and this high ash content and the partings in the seam would absolutely render it impossible to mine any marketable coal from the seam."

As to the Kellioka seam, he testified, "The thickness of the coal would preclude the mining of it at a cost that would be reasonable and the quality of the coal would not pass the market."

This testimony is corroborated by that of other witnesses in position to form an opinion in regard to the matter. The burden of proof was on plaintiff to establish that these two seams of coal are "workable and merchantable." Its evidence does not overcome that of defendant. The experience of the Mahan Ellis Coal Company, five miles away, with the Kellioka seam cannot affect the weight of defendant's testimony as to that seam as it exists on the leased premises. Plaintiff's evidence comes far short of sustaining its burden and for this reason this item of its claim must be denied.

■ The next items for consideration are the fourth and fifth paragraphs of the bill. They are $16,000 for damages for removing dwelling houses from the leased premises; $10,000 for suffering dwelling houses to be out of repair; and $25,000 for suffering tipples, power houses, bath house to be out of repair, and to remove them. There is no liability of defendant for suffering the dwelling houses or any other of the permanent improvements to get out of repair. The defendant was given permission to erect these improvements and there was no agreement on its part to keep them in repair, save possibly so far as sufficient to enable it to remove all workable and merchantable coal which is to be implied. There has been no breach of such agreement as I have found that all such coal has been removed so far as removable by defendant. The express agreement to leave and surrender the leased premises in good condition has no relation to these improve-

ments. What was agreed to be so surrendered was the "leased premises." These improvements were no part of the leased premises. If, however, defendant removed any of these improvements from the premises, it became liable to plaintiff. Upon their erection they became part of the realty and defendant had no right to remove any part of them. The only improvements which the defendant can be said to have removed are a bath house and a tenant house partially destroyed by fire. The defendant sold the latter for $10, and plaintiff is entitled to judgment therefor. The bath house had no value as a standing structure. Its value was limited to the value of the material in it to one who would go to the trouble and expense of removing it. There is no evidence bearing on this subject. I would not be justified in allowing plaintiff more than $100 on this account for which it may have judgment.

■ The final item for consideration is that set forth in the first paragraph of the bill. It is for the royalty on coal removed from the premises and not shipped to purchasers. The claim in this amount is $4,200. The testimony of Adams, defendant's general bookkeeper and assistant secretary, is that its books show that only 219 tons were so removed. This was in the first three years of its operation after the assignment of the lease, 1924, 1925, and 1926. For this tonnage, plaintiff was paid. The only testimony to the contrary of this is that of Larkin Shepard, witness for plaintiff. He testified that he hauled coal to the miners in defendant's camp for three years at the rate of 200 tons a month, for nine months, one-half of which was to miners not on leased premises. This would make 900 tons a year so hauled. It will be noted that his testimony as to time corresponds substantially to the showing of defendant's books. As to the amount so hauled, the books will have to be accepted as against Shepard's uncertain testimony. The testimony of Mr. Fuson makes against the claim. He testified that plaintiff's books showed that previous to the assignment to defendant there was being hauled to miners 300 tons a month, about two-thirds of which was outside the camp making 200 a month for twelve months and for seven years for which it was paid $20 a month. It is not unlikely that defendant enlarged the camp on the leased premises after it took

hold so as to reduce the amount hauled to miners off the leased premises and to end such hauling in the course of a short time. It is a striking circumstance that though prior to defendant's day plaintiff had been paid regularly for coal hauled off the premises it never made any complaint of nonpayment for such coal by defendant. This can hardly be accounted for on any other ground than that defendant paid plaintiff for all the coal so hauled by it. I have dealt with this claim on the assumption that defendant was bound to pay plaintiff for coal hauled to its miners off the premises which defendant questions. I am therefore constrained to deny this claim.

 The plaintiff is entitled to its costs on allowance to it for the tenant house and bath house. The defendant is entitled to its costs on the other items.