Josephine H. BROWNING et al.,
Appellants,

v.

MOUNTAIN STATES COAL CORPORA-
TION, a Corporation, Appellee.

Court of Appeals of Kentucky.

June 10, 1960.

Rehearing Denied Oct. 7, 1960.

Joe Hobson, Prestonsburg, for appel-
lants.

Paul E. Hayes, Barkley J. Sturgill, Prestonsburg, John Y. Brown, Lexington, for appellee.

MOREMEN, Judge.

Appellants sought to recover from appellee annual minimum royalties under two coal mining leases of land in Floyd County. They have appealed from a judgment denying recovery.

On November 1, 1947, appellants, who are heirs at law of W. S. Harkins, Sr., executed to Pike Elkhorn Coal Company a lease embracing six tracts of land. For the privilege of mining, lessee agreed to pay a royalty of 15 cents per ton for all coal mined. In addition it agreed to pay a mimimum royalty during the year 1949 of $2,000. For following years, the amount was gradually increased.

On May 1, 1948, the appellants and Mrs. John C. C. Mayo Company executed a similar lease to the same lessee covering three tracts of land.

In July 1949, the Pike Elkhorn Coal Company was, by court action, placed under receivership and on December 27, 1949, all the property of that company was sold at public auction. The successful purchaser assigned his bid to appellee, Mountain States Coal Corporation. The receiver conveyed the property, which included these leases, to appellee.

In 1950, the successor corporation mined a small amount of coal, and in 1955, 1956, and 1957, a further attempt to merchandise this coal was made. In all about 49,250 tons of coal were taken from one tract. The other tract was not mined at all, but the record indicates that it was of the same quality as that which was mined. Appellee paid the royalty of 15 cents per ton for the coal mined, but no minimum royalties were paid under the terms of the contract.

In August 1956, appellants filed suit to recover minimum royalties which they alleged were due for the years 1950 through 1954.

Appellee, by answer as amended, defended on two grounds: (1) It was excused from payment of the minimum royalties because the coal was not mineable nor merchantable; and (2) after appellee company had purchased the leases under the general receivership sale, appellants had terminated each of the coal leases and had permitted appellee to mine the coal without a lease under an agreement that the only payment would be the sum of 15 cents per ton. These defenses are somewhat inconsistent; however each involves separate provisions of the original leases.

In connection with the first defense these clauses are pertinent:

"To promptly begin work under this lease, and to push developments and operations thereunder as rapidly as the conditions of the market, railroad and labor conditions will reasonably permit."

and

"By the term 'mineable and merchantable' coal as used in this lease is meant coal, which when reached in the prosecution of Lessee's operation hereunder could be mined at a reasonable profit by the use of machinery and methods which at the time are modern and efficient. But this clause is not intended to exempt, nor shall it be construed as exempting Lessee from mining coal which by reason of the local conditions, or thickness of seam or character of coal, temporary labor costs or market conditions, cannot be mined at a reasonable profit, when the general condition of the seam of coal outside or beyond this local situation shall be normal * * *".

Appellee insists that under the yardstick contained in the above excerpts there was no mineable and merchantable coal under this land at the time it purchased the

leases, because it was impossible to mine and sell the coal at a profit. (There is no contention that appellee failed to use efficient methods of mining.) In other words, it contends that since all parties knew the coal was of inferior quality at the time of the lease and its marketability was extremely uncertain, it was the intention of the parties to terminate the leases if reasonable effort to sell the coal at a profit was, in fact, unsuccessful.

Appellants contend that under the law the operator assumes the risk of the market when he accepts a lease, and rely on Lawrence E. Tierney Land Company v. Kingston-Pocahontas Coal Company, 241 Ky. 101, 43 S.W.2d 517, 519, to support this position. The clause which was construed in that case reads:

> "The lessee * * * covenants and agrees that it will work and mine the Freeburn seams of merchantable coal that can be mined at a reasonable profit * * *."

The court held that the lessee was obligated to pay minimum royalties so long as the seams leased existed in quantity and quality as known at the date of the lease, notwithstanding the fact that a falling market made mining the coal unprofitable.

It is uncontroverted in the case at bar that practically all the coal (less about 1000 carloads) remains undisturbed. Its quality is unchanged. The quantity is only slightly diminished. Everyone knew that the coal was of inferior grade and salable only on an extraordinary market. It seems plain that the parties executed the lease with those facts in mind and the "profit" clause was inserted not as a guage to mark the time when the coal seams had petered out, but in order to terminate the contract when an earnest attempt to mine and sell the coal had failed.

We think the provision should be construed in the light of the purposes it sought to accomplish. It seems to us the parties knew that the sale of this coal on a normal market was unlikely and the clause was placed in the lease to act as a safety hatch in the event the attempt to mine it at a profit was futile. The conditions here are quite different from those presented by the execution of the lease in the Tierney Land Company case because there the provision was directed toward compelling the lessee to continue mining so long as the Freeburn seam existed in quantity and quality. By its terms the lessee was forced to mine the coal completely. Another distinction may be found in Martin's Fork Coal Company v. Harlan-Wallins Coal Corporation, D. C., 14 F.Supp. 902, 909, where it was said:

> "The only other decision which plaintiff cites and which can be claimed to be pertinent is that in case of Tierney Land Co. v. Kingston-Pocahontas Coal Co., 241 Ky. 101, 43 S.W.2d 517, 522. This case, however, does not support plaintiff's position. The contract of the lessee there was to mine and pay royalty on a certain specific seam of coal, to wit, the Freeburn seam. It was held that the lessee was obliged to comply with its contract 'so long as the Freeburn seam exists in quantity and quality as known at the date of the lease,' and that it was not relieved from its obligation because by reason of falling prices the coal in that seam could not be mined and sold at a profit. The implication of the discussion is that if the contract had been to mine and pay royalty on all merchantable coal in the premises, the result would have been different."

We agree with appellants that the rule stated in most of the cases decided by this court involving the usual provisions contained in coal leases is that a plea of practical exhaustion of coal is unavailable so long as coal remains in substantial quantity and of the quality known and to be expected at the time of the lease, and that generally the lessee takes the risk of the market. But under the peculiar circum-

stances of this case we are compelled to the view that the risk of the market was the contingency against which the lessee sought to protect himself.

In the case of Muncey Coal Mining Co. v. Muncey, 206 Ky. 638, 268 S.W. 293, where the lessee made diligent efforts to discover coal, but failed to find a workable seam, he was held not obligated to pay mimimum royalties until such a seam was discovered. The same rule should be applied here.

██ At least, under the testimony presented we are unable to hold, as a matter of law, that the parties intended the lessee to assume the risk of the market even if the coal was not merchantable on a normal market. Extraneous evidence as to the intention of the parties having been admissible, and the evidence being such as to leave reasonable minds in doubt, the question was properly submitted to the jury.

Appellants contend that appellee's defense, that the original lease had been canceled and abandoned, should not have been submitted to the jury under instruction No. 4 on the ground that the cancellation was wholly unsupported by any consideration. This requires a statement of additional facts. The proof is certain that Mr. J. D. Harkins, Sr., was the active agent for all the appellants and that he handled all business affairs for the other heirs in connection with these leases.

The lease contains this provision:

"It is further agreed and made a condition of this lease that should the Lessee go into bankruptcy or make a general assignment for the benefit of its creditors, or be in the hands of a Receiver, by reason of impaired financial status, unless such receivership is dissolved within six months thereafter, or said leasehold or the Lessee's property on the leased premises be ordered sold under a judgment of court, then the Lessors shall have the right,

at their option, to declare this lease void and to terminate same and to enter at once and have immediate possession of the leased premises and all of the improvements placed thereon."

A principal witness testified that after appellee had taken the assignment of the bankrupt property, this thing happened:

"A. I came to Mr. Harkins' office out here and talked to him about the possibility of starting the mine and asked him if we had a lease and he said: 'You don't need any,' and I said: 'Why?' and he said: 'Well, you go up there and start the mine. I want my family to get something out of the mine while we are living,' and he said: 'You go up there and mine what coal you can and pay for what you mine,' and I said: 'I don't mean that,' and I said: 'We might take a notion to put in other seams and if we didn't have a lease, you could come up there and push us out,' and he assured me to go ahead and mine the coal and pay for what I mined and it would be O. K. at long as we mined it according to the state mining laws.

"Q. Did he make any statement to you why he didn't want to give you a lease on it? A. Well, I asked him why we didn't need a lease and he said: 'For tax purposes.'"

Mr. Harkins died in 1954. There is testimony in the record to the effect that no demand was ever made for the payment of minimum royalties during his lifetime. There is testimony, however, by appellant Josephine H. Browning that after the death of her brother, Mr. Harkins, she had a conversation with two agents of the appellee company in which she brought up the subject of the lease and told them that appellee had been mining their coal and had never made a statement to any member of the family or to the executor of Mr. Joe Harkins' estate and they did not at that

time make any claim that the lease had been canceled and a new agreement made.

■ There was sufficient contrariety of testimony to authorize the submission of this question to the jury and it was properly done by instruction No. 4. Without a detailed discussion of instructions Nos. 1 and 2, we believe it is fair to state that they were highly favorable to appellants.

The case was fairly tried and submitted to the jury and the judgment is therefore affirmed.