## Barney v. Sword et al.

(Decided December 11, 1928.)

### Appeal from Pike Circuit Court.

1. Mines and Minerals.—In construing mining lease as between lessor's successors in title and one who acquired lease from trustee in bankruptcy of lessee's assignee, rights of parties must be measured and determined by intention as expressed in original lease.

2. Mines and Minerals.—Where there was no workable seam of marketable coal in mine when defendant acquired mining lease, lease had terminated, and defendant was not responsible for minimum royalty during time he was engaged in making preparations to work mine, patricularly in view of provision of lease providing for suspension of payment of royalties, if mining was interrupted by unavoidable hindrances.

3. Mines and Minerals.—Provision in mineral lease granting lessee right to use surface necessary for purpose of mining held construed to include period when there was no workable seam of marketable coal left in mine, during which defendant made preparations to work mine, not knowing all mineable seams had been worked out.

MOORE & CHILDERS for appellant.

STRATTON & STEPHENSON for appellees.

OPINION OF THE COURT BY COMMISSIONER STANLEY—
Reversing in part and affirming in part.

On November 10, 1906, Morgan Sword and others (predecessors in title of appellees) leased a body of land in Pike county to W. T. Griffith, trustee, which lease by mesne assignments became the property of the Winston-Elkhorn Coal Company, and at a sale by its trustee in bankruptcy, on March 17, 1926, the appellant, J. D. Barney, acquired the lease. Shortly thereafter Barney took possession of this property, and set about clearing the entrance ways, repairing and improving the outside mining equipment preparatory to operation of the mine, it not having been operated for some time previous. At the time of his purchase, Barney had not examined the interior of the mine, because, as he says, the drift mouth and some entries had caved in. When he got these sufficiently cleared for his examination, it was disclosed that all mineable seams had been worked out and the roof fallen in to such an extent that the remaining pillars could not be removed. That the mine could not be operated at a profit, if at all, and that there was no seam of coal of suitable thickness and merchantable quality, is abundantly proven, with practically no evidence to the contrary. When Barney ascertained this condition, he began salvaging the equipment and tearing down the miners' houses. No coal was mined, except a negligible quantity used in the power house. Some of the appellees, owners of the property, knew of the work of reclamation and abandonment, and they took possession of the premises, but no formal notice was given. There is no evidence of interference with appellees in their use of the surface retained by them, except possibly slight use of a roadway through a field, which, however, appears to have been necessary in the work of re-establishment and repair.

This suit was instituted by the appellees to recover the minimum royalty from the time the appellant took possession of the property in March, 1926, amounting to $1,533.60. The court awarded judgment for $500 against the appellant, from which he appeals, with appellees prosecuting a cross-appeal.

The rights of the parties must be measured and determined by the intention as expressed in the original lease. Undoubtedly the intention was to give and take possession of the property only for the purpose of mining

coal for the market and a reasonable period of time to make preparation therefor. The royalty or rent was dependent upon results obtained from such preparation and development.

The lease provides that it was for "general coal mining purposes . . . until the entire body of coal is mined and shipped." The lessee was given the right to mine and remove the coal "that is of suitable thickness and merchantable quality," with the right to use the surface necessary for that purpose and timber of certain dimensions. He bound himself to mine only "workable seams of mineable coal." The quarterly payment of tonnage royalties was provided for, the minimum for the third and subsequent years, "as long as possession is held under this lease" to be an amount equal to $3 an acre. The payment of royalties, however, was to be suspended when operations should be hindered by strikes and other "unavoidable hindrances."

The question presented is whether under this contract the appellant, as lessee, is responsible for the minimum royalty during the time he was engaged in making preparations to work the mine and before his abandonment. We think not. The evidence discloses that, at the time he acquired the lease, there was no workable seam of marketable coal in the mine. The lease had thereby been terminated. Auxier Coal Co. v. Big Sandy & Millers Creek Coal Co., 194 Ky. 14, 238 S. W. 189. Hence, as stated in that opinion: ". . . It would inevitably follow that claims for royalties thereafter arising are without merit"; and, further, "claims to minimum royalties, arising after the minerals were exhausted, are impossible of sustention." In the instant case the exhausted condition of the mine was demonstrated during the time appellant was preparing to reopen it, on which work, it may be said, he spent a considerable sum. In the Auxier case also it appeared that the exhaustion existed when the lease was made, and there was evidence showing the lessee was apprised of that fact when he made the lease. The question was then presented, as stated in the opinion:

"Must the provision, therefore, be strictly enforced under such condition? We think not, for if appellants knew the condition of the mine, though honestly believing it to be susceptible of profitable operation when in fact it was not, in good conscience

they cannot be permitted to enforce a provision which is interdependent upon other unenforceable provisions and about which the other party was misinformed when the contract was made.''

In Muncey Coal Mining Co. v. Muncey, 206 Ky. 638, 268 S. W. 293, the lease, which was originally made with another, came into the ownership of the appellant, who spent considerable money and time earnestly striving to find a workable vein of merchantable coal. It was over two years from the date of the lease until this was found, and the claim was made against the appellant for minimum royalties during that period. One of the contingencies, the happening of which relieved the payment of royalties for a time, was ''the failure of workable coal,'' which was construed to mean that, if during the mining operations such a seam should give out, and then be rediscovered at a later date, or another like seam found, there was no obligation to pay the minimum royalty during the interim. We expressed ourselves concerning such a contract thus:

> ''We think that, where, as here, the evidence shows the lessee in good faith makes reasonable and diligent efforts to discover coal, the fact that he fails to discover it without negligence on his part, although it may be present on the premises, does not oblige him under a clause in a lease like the one here at bar to pay the minimum royalty until it is discovered.''

The lease involved in this suit, as stated, provided for a suspension of the payment of royalties, if mining was interrupted by unavoidable hindrances. The condition of this mine was certainly an unavoidable hindrance within the meaning of the contract.

The principles upon which the two cases cited are based constrain us to hold that, where the lessee has exhibited the good faith and diligence shown in this case, he should not be compelled to pay the minimum royalties during the time he was preparing to renew operations and mine coal, which subsequent developments showed could not be successfully done within the terms of the lease.

There is no basis for the judgment of $500 rendered against appellant, unless it be on the theory that the les-

sors were deprived of the use of the surface occupied by the mining apparatus during this time. The grant of those surface rights to the lessee must be construed as including this period. In any event, there was no evidence of value of the use of the premises warranting a judgment on a quantum meruit basis.

The judgment is reversed on the original appeal, and affirmed on the cross-appeal.