# Gorman v. Lusk et al.

(Decided May 25, 1937.)

F. J. EVERSOLE and J. E. JOHNSON, Jr., for appellant.

FAULKNER & FAULKNER and BAILEY P. WOOTTON for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming.

The appeal is from a judgment cancelling a coal lease made on October 12, 1933, jointly, by Joseph Lusk and W. B. Lusk, and their respective wives, to Perry F. Gorman. The Klenekole Mining Company joined in the lease as the owner of the mining equipment on the premises. The rent for it was to be paid to the Lusks until a certain debt that company owed them should be satisfied. The property is described as two adjoining tracts, one being owned by Joseph Lusk and wife, and the other by W. B. Lusk and wife. They were leased for mining as one tract. The issue was whether the lessee had forfeited the lease because: (1) He had failed to pay the stipulated royalties; or (2) had failed to work the mine according to the mining laws of the state and modern and efficient methods; or (3) had failed to keep an experienced engineer to lay out the work of the mine and to keep a map showing what coal had been mined. The mine had not been operated for more than sixty days before the filing of the suit. The plaintiff Joseph Lusk further claimed $1,500 in damages for coal lost by

the improper operations of the lessee. The issue as to the Klenekole Mining Company was the right to cancel because of a failure to pay 5 cents per ton rental for its equipment. Denying material allegations of the petition, the defendant pleaded that he had been prevented from operating the mine during March, April, and May, 1934, on account of riots and strikes and was released from paying rentals during the period by the terms of the lease. He further alleged that the Joseph Lusk tract was exhausted and there was no coal on it that could have been mined at a profit or without a loss. The attachment of the coal in railroad cars and refusal to consent to its prompt shipment necessarily caused the defendant, he alleged, to close the operations. These things were set up as justification for the grounds of forfeiture and cancellation of the lease pleaded by the plaintiffs.

As cause for a counterclaim, the defendant alleged that when he took over the property the mine had not been operated for a year or more and had become out of repair, and unsafe, and had an accumulation of water. The leased machinery was also in bad repair. He had necessarily expended $7,000 and three months' time in reconditioning the mine when he discovered the exhausted condition of the Joseph Lusk tract. He had removed all the coal that he could when the suit was filed against him by Joseph Lusk and wife, wrongfully attaching twelve cars of coal of the value of $950. This was charged to have been done by collusion of all the parties and to have resulted in the defendant's inability to conclude negotiations with other coal landowners from whose property he had the right, under the terms of the lease with the plaintiffs, to transport coal over the property leased from them. Other items of lost profits of $11,200 and attorneys' fees of $1,500 incurred in defending the attachment made an aggregate of $20,650, for which the defendant asked judgment over against the plaintiffs. In adjudging that the lease be canceled on account of its breach by the defendant, his counterclaim was dismissed without prejudice.

The lease provided for the monthly payment of royalty of 10 cents per ton, with the further provision:

"The said lessee shall pay to the lessors the sum of Six Hundred ($600.00) Dollars each per year from the date of this lease as a minimum

royalty for the coal mined from said land until said lessors' coal is exhausted, said sums to be paid monthly on the 25th day of the month for the preceding month. This minimum royalty shall be paid regardless of whether the amount of coal produced in any one month shall amount in royalties at ten cents per ton to the installment for that month and said royalty, whether it be ten cents per ton for the coal mined or the minimum royalty, shall be paid to each of the lessors herein, J. E. Lusk and W. B. Lusk, according to the number of tons taken from his respective tract of land and the minimum royalty shall be paid to each of the lessors herein $50.00 per month each. It is provided, however, that if the lessee should fail in any one month, after operations are begun, to mine sufficient quantity of coal to pay said minimum royalty, although the same shall have been paid, then the lessee shall have the right in any succeeding month for one year thereafter, after the minimum for such succeeding months shall have been mined and paid for, to mine sufficient coal free from any royalty or rent to reimburse itself for the rents and royalties paid in such preceding month or months in excess of the coal actually mined in such preceding month or months.''

It is also provided:

''Should the lessee herein fail for thirty consecutive days to pay the rents, royalties and other payments therein agreed to be paid, this lease shall be forfeited; and it is hereby agreed that the lessee will surrender the possession of same to the lessors or their agents without notice.''

The only contingencies excusing the payment of the minimum royalty are that the lessee was prevented from operating the mine by reason of fire, flood, or riots, or insufficient railroad cars, or the exhaustion of the coal without lessee's fault. But the right to a release from the payment because of these interruptions is protanto and is conditioned upon the lessee furnishing monthly reports to the lessors of the sums thereby lost for which credit shall be claimed. Written notice was given the lessee on August 2, 1934, that a forfeiture of the lease was claimed upon several stated grounds as provided therein, effective sixty days later.

The lease called for the two separately owned

tracts to be treated as one for operation, but in the matter of royalties, both minimum and those based upon tonnage, the two owners were to be regarded individually. The lessee so regarded the contract. Koppers Company v. Asher Coal Mining Company, 226 Ky. 492, 11 S. W. (2d) 114. For the five months ending March 31st, he was in arrears $132.50 in minimum royalties due Joseph Lusk. He had paid him only $17.50 since the beginning. In July, when suit was filed by that lessor to collect the royalties, Gorman was owing him $387.50, unless it could be said he was relieved of the obligation by the exhaustion of the coal on that portion of the mine owned by Joseph Lusk, or was excused from liability for the months of April, May, and June on account of a strike. It appears that operations ceased shortly after the coal on the railroad siding was attached in that suit. This cessation, it was claimed by the lessee, was made necessary because the railroad siding would not hold any more cars than those tied up and he had no other facilities for taking care of the coal which he might have had extracted.

We may first consider the evidence relating to the exhaustion of the profitable coal from Joseph Lusk's property. If as a matter of fact there was no workable seam that could be mined with profit when the lessee began operations, or if the coal became exhausted at any time during the continuance of the lease, he was relieved of the payment of the minimum royalty. Barney v. Sword, 226 Ky. 728, 11 S. W. (2d) 920; Laurence E. Tierney Land Company v. Kingston-Pocahontas Coal Company, 241 Ky. 101, 43 S. W. (2d) 517. As we understand the record, this part of the mine was that nearest the entrance and it had been worked for several years before this lease was undertaken by the appellant. The W. B. Lusk property seems to have been principally back of the other and it was necessary that it be mined out through the Joseph Lusk tract. It is clear there had been much bad mining of this tract in the past. At least, it was in bad condition when Gorman took it over. He and his witnesses testified that there was little or no available coal that could be mined at a profit except the pillars, and, though the pillars could be worked profitably, to have done that would have destroyed access to the other body of coal. On the other side, there was evidence that there were at least 40,000 tons of profitable coal other than the pillars. We do not regard the

evidence introduced in behalf of defendant as sustaining the burden resting upon him. There were no facts or figures given, but only the opinions of witnesses that the coal could not be mined profitably.

It appears that the miners employed by the lessee became dissatisfied with their working conditions and went out on strike on March 12th, and remained out until June 12th. At the beginning there was some violence by the strikers and men who wished to continue work. This violence did not continue very long but the mine was not operated. The contract provided for suspension of minimum royalty payments because of riots. It made no provision in case of a strike. The evidence is that the mine was closed because of a strike and not because of a riot. The evidence does not establish that the strike was without fault of the appellant, and it does not seem to us that the circumstances relieved him of the compliance with the terms as to the payment of minimum royalties. In any event, the right to a suspension was protanto, and nothing was paid for prior or subsequent periods. Cf. Elkhorn-Hazard Coal Company v. Fairchild, 202 Ky. 635, 260 S. W. 1115; Muncey Coal Mining Company v. Muncey, 206 Ky. 638, 268 S. W. 293.

There was no express provision to the effect that a wrongful interference by the lessors or any of them with the operation of the mine would excuse performance by the lessee. But if, as a matter of fact, there had been such wrongful interference, under general contract law respecting the liability of the party who first breaches a contract, the lessee would have been justified in closing the mine. So if the act of the lessors in tying up the facilities of the mine so it could not operate by attaching cars of coal covering the entire railroad siding and refusing to permit its removal until a trial could be had, there would be some right to a suspension of minimum royalty payments. But the allegations of wrong were not established by proof. Gorman endeavored to effect a release of the situation by agreement, but he never undertook to execute a bond as he might have done under the provisions of section 214, Civil Code of Practice. When the cars were moved and operations might have been resumed, notice had been served of a cancellation of the lease according to the terms. The conditions calling for a forfeiture for noncompliance with the provisions respecting the payment of royalty

had already materialized, and, while making these observations, we do not need to decide the effect of this act on the part of one of the lessors.

Nor is it necessary to consider other grounds upon which appellees' right to cancellation rests, namely, the failure to work the mine in accordance with the laws of the state and with modern and efficient mining methods (concerning which issue the evidence was conflicting), or whether the agreement to employ an experienced and competent mining engineer to make surveys of the coal area and provide plans for mining the coal was met by the lessee himself undertaking to do that work.

The payment of minimum royalties must be paid according to the contract if the lease is to be kept alive. Certain contingencies were provided for suspending payment or absolving liability altogether. The burden is upon the lessee to show one or more of those conditions had existed. Elkhorn Coal Corporation v. By-Products Coal Company, 237 Ky. 436, 35 S. W. (2d) 898.

It seems to us the conclusion of the special chancellor, the late Hon. O. H. Pollard, that legal justification for nonpayment of the royalties was not established was correct.

The judgment is affirmed.